STATE of Minnesota, Respondent,

v.

Dontrell Dyna FLOWERS, Appellant.

No. A05–213.

Supreme Court of Minnesota.

June 28, 2007.

Lori Swanson, Attorney General, Assistant Attorney General, St. Paul, MN, Michael O. Freeman, Hennepin County Attorney, David Craig Brown, Assistant County Attorney, Minneapolis, MN, for Respondent.

John M. Stuart, State Public Defender, Cathryn Middlebrook, Assistant State Public Defender, Minneapolis, MN, for Appellant.

Heard, considered, and decided by the court en banc.

## OPINION

ANDERSON, PAUL H., Justice.

Dontrell Dyna Flowers was convicted of being a prohibited person in possession of a firearm, in violation of Minn.Stat. § 624.713, subd. 1(b) (2006), after the police found a gun in the vehicle he was driving. Flowers appeals his conviction, arguing that (1) the district court erred when it did not suppress the gun found during the search of the vehicle; (2) the

court erred when it allowed Flowers to be impeached with a prior conviction; (3) the court erred when it denied Flowers' motion for a mistrial after an officer improperly testified that the gun was stolen; and (4) the court issued an improper additional instruction when responding to a question from the jury after the jury began its deliberations. The Minnesota Court of Appeals affirmed. *State v. Flowers*, No. A05–213, 2006 WL 1228997 (Minn.App. May 9, 2006). We reverse.

At approximately 11 p.m. on June 12, 2004, appellant Dontrell Dyna Flowers was stopped by the Minneapolis police while driving a motor vehicle in south Minneapolis.[1] The two officers who stopped Flowers testified that they first observed Flowers driving the vehicle eastbound on 43rd Street, just east of Pleasant Avenue. The officers testified that they initiated the stop because the vehicle that Flowers was driving had no rear license-plate light.

The stop was partially videotaped by a camera located in the officers' squad car. The videotape begins just as the officers activated their emergency lights and indicates that when the emergency lights were activated, Flowers had turned into an alley

between Pleasant Avenue and Pillsbury Avenue.[2] Flowers did not immediately stop when the officers activated the emergency lights; rather, he drove very slowly down the alley. The officers aimed the squad car's spotlight directly into Flowers' car. As Flowers was driving down the alley, he first leaned left for a few seconds and appeared to be shifting his position in his seat. Observing Flowers' movements, the officers sounded their air horn. Then, for about five seconds, Flowers leaned all the way to his right, toward the passenger door. At one point, only Flowers' head and the hand he had on the steering wheel were visible on the videotape. The officers again sounded their air horn. Flowers sat up after leaning to his right, and it appeared that his attention was again directed to his left—toward the driver's door. At that point, the officers turned on the siren in their squad car. Flowers continued to look to his left and continued to shift his position in his seat. The total duration of the foregoing movements was approximately 45 seconds.[3]

The alley running from 43rd Street to 42nd Street is narrow and comprises only one lane. At trial, one of the officers

---

1. At trial, Flowers introduced evidence that he was not the registered owner of the vehicle.

2. The record is not clear as to exactly when the officers activated their emergency lights. One officer testified that Flowers turned into the alley after the officers activated their emergency lights. But the other officer testified that they activated their emergency lights "just as the vehicle was turning" into the alley or "right about at the same time as he was turning." Additionally, he testified that the camera in the squad car "comes on automatically when you turn on the lights." As noted previously, when the videotape begins, Flowers is already in the alley.

3. There is a timestamp on the videotape that indicates the officers initiated the stop by activating their emergency lights at 10:50:16 p.m.

As the squad car turns into the alley, only the back end of the vehicle that Flowers is driving is visible on the videotape. At approximately 10:50:20, Flowers can be seen on the tape. Within a few seconds, it appears that Flowers is leaning to his left and shifting his position in his seat. This continues until 10:50:29 when the officers first sound their air horn. At that point, Flowers leans all the way to his right, and at one point only his head and the hand he had on the steering wheel are visible. At 10:50:34, the officers again sound their air horn. Two seconds later, Flowers sits up again in his seat, and it appears that Flowers' attention is directed to his left. At 10:50:42, the officers activated their siren. Flowers continued to look to his left and continued to shift his position in his seat until approximately 10:51:11.

testified that Flowers was driving "[e]x-tremely slow[ly]" through the alley, and later indicated that Flowers was traveling at a speed of "approximately three miles an hour." The videotape indicates that the alley was not well lit. After exiting the alley, Flowers turned eastbound onto 42nd Street, immediately pulled to the curb, and stopped. Approximately 75 seconds had passed between the time the officers initiated the stop by activating their emergency lights and the time Flowers stopped on 42nd Street.

Once Flowers stopped the vehicle, the two officers conducted a "felony stop." Instead of approaching Flowers on foot, the officers remained next to their squad car, and with their guns drawn, ordered Flowers to roll down the driver's door window and throw the car keys out of the vehicle. The officers then ordered Flowers to open the door and step out with his hands up. After Flowers complied, the officers ordered him to walk backward toward the squad car, and then to lie flat on his stomach with his arms and legs spread. The videotape shows that by the time Flowers had complied with all of these orders, at least two additional squad cars had arrived at the scene.

Two officers then approached Flowers as he was lying on the pavement.[4] One officer handcuffed Flowers' hands behind his back and the other used a flashlight to look for one or two seconds into the vehicle that Flowers had been driving. After Flowers was handcuffed, an officer again used a flashlight to look into the vehicle for one to two seconds. The officers asked Flowers what he had in the vehicle, and Flowers responded that he did not have anything in the vehicle. One officer then searched Flowers for approximately 35 seconds while Flowers was still lying on the pavement. The search of Flowers re-vealed no weapons or contraband. The videotape shows that by the time this search was completed, at least five officers were on the scene. Following the search of Flowers, three officers helped him stand up and he was then confined in the back seat of one of the squad cars.

While Flowers was being searched, another officer searched the interior of the vehicle. This vehicle search was also captured on videotape. The officer opened the driver's door, looked around the driver's seat, and then entered the vehicle. After the officer entered the vehicle, a second officer approached the vehicle and stood by the driver's door, apparently observing while the first officer searched the vehicle. When the first officer was inside the vehicle, he looked around the passenger seat and then disappeared from the view of the camera for approximately five seconds as he apparently searched under the seats. The first officer then came back into view and looked in the back seat. The entire search of the vehicle lasted approximately 30 seconds. The search revealed no weapon or contraband. When the first officer left the vehicle, he began talking with the second officer and a third officer who had approached the vehicle. The three officers stood next to the driver's door for approximately twelve seconds while they were talking. A fourth officer then approached the group of officers standing by the driver's door. One of the officers closed the driver's door, and the officers continued talking. The last five seconds of the videotape show that while the officers continued talking outside the closed driver's door, one of the officers directed her flashlight into the vehicle for approximately five seconds. The officer is still directing her flashlight into the vehicle when the videotape stops. One of the

**4.** It is unclear whether these two officers are the same two officers who initiated the stop.

officers testified that the camera was turned off because "[t]he situation was under control."

The two officers who initiated the stop testified that after completing the search of the vehicle, they called a fellow officer with a drug-sniffing dog to the scene to search for evidence of illegal drugs. The dog sniffed the vehicle, but did not alert to any evidence of drugs or other contraband. The record does not indicate how long it took to complete the dog-sniff search.

After the dog-sniff search ended, the officers again searched the vehicle. As previously noted, the videotape ends after the earlier search of the vehicle's interior and before the dog-sniff search occurred; therefore, evidence in the record of what happened next comes from the testimony of the arresting officers. One officer testified that he approached the vehicle and noticed that the panel on the driver's door was loose from its frame, so he pulled the panel "away from the frame a little bit" and saw what appeared to be the butt of a gun "between the panel and the door frame, in the door." The officer then lifted the power-window control panel located on the door's armrest and found a semi-automatic 9 millimeter gun under the power-window control panel.

There is no information in the record regarding how long it took the officers to find the gun or how long Flowers was detained after the videotape ended and before the gun was found. One of the officers testified in a pretrial evidentiary hearing that at the time the officers initiated the stop, they did not know who Flowers was. There is no indication in the record that before the officers found the gun they had any knowledge that Flowers was a convicted felon who was not entitled to possess a gun. A subsequent check of Flowers' criminal record, however, revealed that he had previously been convicted of aiding and abetting second-degree unintentional murder. Based on this prior conviction, Flowers was charged with being a prohibited person in possession of a firearm, a felony offense under Minn.Stat. § 624.713, subd. 1(b).

At a pretrial evidentiary hearing, one of the officers who initially stopped Flowers testified that as Flowers was driving down the alley, he "made a real distinct lunging motion" toward the passenger door, and then made "some motions down to his left." The officer testified that after observing Flowers' actions in the vehicle, he believed Flowers may have been trying to conceal some type of contraband.[5] The other officer who initially stopped Flowers testified that Flowers made "frantic, furtive movements," and leaned "all the way into the * * * front passenger's seat to the point where you almost couldn't see him." The officer further testified that Flowers raised his hand "to slam it on the door panel" and it looked like Flowers was "manipulating the driver's door * * * like he was trying to take it apart, trying to put it together, pulling it apart or something."[6] The officer then testified that because of these movements, his first thought was that Flowers might have a gun.

Flowers moved to suppress the gun on the grounds that the search was not supported by probable cause or reasonable

---

**5.** The officers did not testify, as the dissent suggests, that they "*observed* Flowers trying to hide something from them" in the vehicle. Rather, they testified that they believed, based on his movements, that Flowers may have been trying to conceal something in the vehicle.

**6.** The officer acknowledged that his report about the incident made no mention of the "slamming."

suspicion and the search exceeded the permissible scope of a *Terry*[7] search. The district court heard testimony and arguments on the suppression issue, and both Flowers and the state submitted briefs. The court ultimately denied Flowers' motion to suppress the gun.

Before trial, Flowers stipulated that he was a person who was not entitled to possess a firearm for purposes of Minn. Stat. § 624.713. Flowers also made several motions in limine seeking, among other things, to prevent the state from impeaching Flowers with his prior conviction for aiding and abetting second-degree unintentional murder and to prevent any reference to the fact that the gun was stolen.

The district court heard arguments on the impeachment-by-prior-conviction issue, including the factors we set forth in *State v. Jones*, 271 N.W.2d 534, 537–38 (Minn. 1978). The court then ruled that if Flowers testified at trial, the state could impeach him with his prior conviction. But the court did not make a record of the reasons for its ruling. At trial Flowers made a record to show that (1) he chose not to testify based on the court's ruling that he could be impeached by the prior conviction; and (2) he would have testified if the court had not ruled that the state could use his prior conviction to impeach him.

The district court granted Flowers' motion to prohibit the state from eliciting any testimony about the origin of the gun, and the court specifically prohibited testimony relating to whether the gun was stolen. On direct examination at trial, the state posed the following question to one of the officers who participated in the stop: "Was anything found inside of the vehicle that would consist of either a weapon or illegal contraband?" The officer answered:

"There was a *stolen* gun found in the vehicle." (Emphasis added.) There were no other references at trial to the gun being stolen. Subsequently, Flowers moved for a mistrial on the ground that the officer gave prohibited testimony.

The state responded to Flowers' mistrial motion by informing the district court that it had discussed the court's limitation on stolen gun testimony with the officer before he testified, and specifically instructed the officer not to mention the fact that the gun was stolen. The state then argued that the officer's statement did not warrant a mistrial because it was not "all that prejudicial" given that it was only mentioned in passing. The state suggested that the court could either issue a curative instruction or do nothing about the improper testimony because the inadmissible fact was only mentioned in passing.

The district court denied Flowers' motion for a mistrial, finding the officer's testimony to be "inadvertent, in passing, [and] not repeated [or] returned to by the prosecutor during the subsequent questioning." The court also noted that the fact that the gun was stolen was not a central issue in the case. The court said that it did not believe the statement was intentional or designed to prejudice the jury in any fashion. Nonetheless, the court issued a curative instruction before the parties made their closing arguments.

Before excusing the jury for its deliberations, the district court issued, in pertinent part, the following instruction:

> The statutes of Minnesota provide that certain persons who possess a pistol or other firearm are guilty of a crime. The elements of possession of a pistol or a firearm are as follows: First, the defendant knowingly possessed a pistol or

---

7. See *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

other firearm or knowingly exercised dominion and control over it.

\* \* \* \*

A person possesses a pistol or a firearm if it is on his or her person. A person also possesses a pistol or a firearm if it was in a place under his or her exclusive control to which other people did not normally have access or if the person knowingly exercised dominion and control over it.

The latter part of this instruction was given at the state's request. The defense indicated that it had no objection to the instruction.

During deliberations, the jury submitted the following question to the district court:

The [instruction] states the defendant must *knowingly* possess the firearm, or knowingly exercise control over it. However, the definition of possession does not appear to require knowledge of the firearm if it was in a place under his exclusive control. Is *knowledge* required for the defendant to be guilty?

The defense requested that the court answer the jury's question by saying, "yes, knowledge is required for the defendant to be guilty." But after the court declined to give this answer, the defense helped formulate a "compromise" answer, which the court then gave to the jury. The court's answer read as follows:

Knowledge is required for possession. Knowledge may be inferred if the firearm was in a place under his exclusive control to which other people did not normally have access.

Shortly after the district court issued its answer to the jury's question, the jury returned with its verdict, finding Flowers guilty of being a prohibited person in possession of a firearm. The court then convicted Flowers of this crime and sentenced him to 60 months in prison.

Flowers appealed his conviction to the court of appeals, making four arguments: (1) the district court should have suppressed the gun because the police lacked probable cause or reasonable suspicion to search the vehicle Flowers was driving, and even if the police did articulate a reasonable suspicion, the search exceeded the permissible scope of a *Terry* stop; (2) the court abused its discretion when it ruled that Flowers could be impeached with a prior conviction; (3) the court abused its discretion when it denied Flowers' motion for a mistrial after an officer testified that the gun was stolen, even though the court previously ruled that this fact was inadmissible; and (4) the court issued an improper additional instruction when responding to a question from the deliberating jury. The court of appeals affirmed the district court, holding that the search of the vehicle was justified under both a probable cause and a reasonable suspicion standard. *Flowers*, 2006 WL 1228997, at *2. The court of appeals also held that the district court did not abuse its discretion when it ruled that Flowers could be impeached with a prior conviction or when it denied Flowers' motion for a mistrial, and that the district court's answer to the jury's question did not materially misstate the law. *Id.* at *3-5. Flowers petitioned our court for review of the four issues considered by the court of appeals, and we granted review.

## I.

We turn first to the issue of whether the district court erred when it denied Flowers' motion to suppress the gun as evidence. When reviewing pretrial orders on motions to suppress evidence, we review the facts to determine whether, as a matter of law, the court erred when it failed to suppress the evidence. *State v. Harris,* 590 N.W.2d 90, 98 (Minn.1999).

When the facts are not in dispute, our review is de novo, and we must determine whether the police articulated an adequate basis for the search or seizure at issue. *See id.*

■■■ Both the Fourth Amendment to the United States Constitution and Article I, Section 10 of the Minnesota Constitution protect the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." A search conducted without a warrant issued upon probable cause is generally unreasonable. *State v. Burbach,* 706 N.W.2d 484, 488 (Minn.2005). The state has the burden to prove that, in the absence of a search warrant, there was probable cause to conduct a search. *See State v. Ture,* 632 N.W.2d 621, 627 (Minn. 2001). Here, it is undisputed that the officers did not have a warrant to search Flowers or the vehicle he was driving. Therefore, the search is unreasonable unless the state proves that the search fell within one of the exceptions to the warrant requirement. *Id.* The state argues that two exceptions are relevant in this case— the automobile exception and the *Terry* search exception. We will first address the automobile exception and then the *Terry* search exception.

A. Automobile Exception

■■■ When probable cause exists to believe that a vehicle contains contraband, the Fourth Amendment permits the police to search the vehicle without a warrant. *Maryland v. Dyson,* 527 U.S. 465, 467, 119 S.Ct. 2013, 144 L.Ed.2d 442 (1999). This type of search is allowed under the automobile exception to the warrant requirement. *See State v. Search,* 472 N.W.2d 850, 852 (Minn.1991) ("Under the automobile exception to the warrant requirement, police may search a vehicle without a warrant * * * if they have probable cause to believe the search will result in a discovery of evidence or contraband."). The state argues that the officers had probable cause to believe that the vehicle Flowers was driving contained contraband. The district court did not rule on the probable cause issue, but the court of appeals held that there was probable cause for the search because (1) Flowers made "furtive movements following the officers' indication that he stop"; (2) Flowers failed to stop "until he had driven suspiciously for an entire block"; (3) the officers "claim[ed] that they were patrolling a high-crime area";[8] and (4) the officers claimed that Flowers' movements were consistent with someone trying to reach for or hide a weapon or contraband. *See Flowers,* 2006 WL 1228997, at *2.

Our case law does not support the result reached by the court of appeals. We have generally required more facts than are present in this case to support a finding of probable cause to search a vehicle. For example, in *State v. Dineen,* we concluded that an officer's observation of the defendant's "furtive movement, reaching into the back seat," and the defendant's refusal to comply with the officer's request to remove a coat from the back seat did not give the officer probable cause to search the vehicle. 296 N.W.2d 421, 422 (Minn. 1980). In *State v. Gallagher,* we ruled that an officer did have probable cause to conduct a search. 275 N.W.2d 803, 808 (Minn. 1979). But in *Gallagher* the officer had already approached the stopped vehicle when he noticed that the passenger was moving furtively in an attempt to conceal the contents of a paper bag, and the officer also observed that the defendant's eyes

---

**8.** We note that there was no evidence presented which indicates that the neighborhood in which this stop took place was a "high-crime" area.

were "wide" and "glassy." *Id.* at 807–08. Further, other than this case, we know of no court of appeals decision finding probable cause under circumstances similar to those now before us. *See, e.g., State v. Munoz,* 385 N.W.2d 373, 376 (Minn.App. 1986) (stating that "[f]urtive gestures can provide a basis for probable cause," but noting that the totality of the circumstances also included an informant's tip that the defendant was trying to sell drugs and an officer's personal knowledge of the defendant's criminal history).

We also note that in the majority of cases from other jurisdictions, a driver's furtive movements have only been used in combination with other facts to support a finding of probable cause. For instance, the officers may know that the defendant had a criminal record, they may be acting on a tip, or they may see or smell evidence of alcohol, drugs, or guns in the vehicle.[9] In the absence of these types of additional facts, courts have been reluctant to conclude that a search based on a driver's furtive movements is supported by probable cause. *See, e.g., United States v. Parr,* 843 F.2d 1228, 1229, 1232 (9th Cir.1988) (noting that the defendant "ben[t] towards the floorboard," made furtive movements as the officer was stopping him, and partially drove up onto the sidewalk before stopping, but concluding that the officers did not have probable cause to believe that the vehicle contained contraband). In this case, the facts do not indicate that the officers had any knowledge of Flowers' criminal record, that they were acting on a

tip, that they had perceived evidence of alcohol, drugs, guns, or other contraband in the vehicle, or that they had other additional facts that were sufficient to support a finding of probable cause. We therefore conclude that, at the time Flowers pulled to the curb and stopped the vehicle, the officers did not have probable cause allowing them to search the vehicle under the automobile exception to the Fourth Amendment.

The dissent contends that even though the officers did not have probable cause to search the vehicle by the time Flowers pulled to the curb, the officers gained probable cause during their investigation after Flowers stopped the vehicle. We note again that the state has the burden to prove that the officers had probable cause to conduct the search. *See Ture,* 632 N.W.2d at 627. Here, the state has not advanced arguments to support the notion that the officers had probable cause based on (1) Flowers' response to the officers' questions about what he had in the vehicle, (2) the officers' failure "to discover anything to explain Flowers' movements," and (3) one officer's observation that the driver's door had a loose panel. Nevertheless the dissent contends that the state has met its burden on those grounds.

First, the dissent argues that when the officers asked Flowers what he had in the vehicle, Flowers' response—"nothing"—gave the officers probable cause to search the vehicle. The dissent's support for this proposition is *State v. Willis,* a case in

---

9. *See, e.g., United States v. Spencer,* 1 F.3d 742, 745–46 (9th Cir.1992) (concluding that the officers had probable cause to search a vehicle after the officers observed the defendant's furtive movements in the vehicle, the driver failed to present a valid driver's license, the defendant presented a "jail identification" when asked to identify himself, and the officers discovered a shoulder holster under the defendant's jacket when they conduct-

ed a *Terry* frisk); *United States v. McCarty,* 862 F.2d 143, 147 (7th Cir.1988) (concluding that the officers had probable cause to *stop* and arrest the defendant because the officers knew that he was a convicted felon, and they knew, in part based on information from a confidential informant, that the defendant was likely to be carrying a weapon, and they observed the defendant make a furtive gesture before he stopped his vehicle).

which we recognized that such answers may "increase[ ] the [officers'] grounds for suspicion." 320 N.W.2d 726, 728 (Minn. 1982). But in *Willis* we concluded there was probable cause only after we noted that the officer, while "[s]tanding where he had a right to stand * * * saw, in open view, the clip of the gun protruding from under the seat." *Id.* Thus, even if we acknowledge that Flowers' response that he had "nothing" in the vehicle may have increased the officers' reasonable suspicion, we cannot conclude that Flowers' statement gave the officers probable cause to search the vehicle.

The dissent next argues that the officers gained probable cause as a result of their failure "to discover anything" in the search of Flowers, the 30-second search of the vehicle, and the dog-sniff search of the vehicle. We cannot find any case law that supports the dissent's position, and we find it difficult to understand exactly what rule of law the dissent is advancing by this argument. It is counterintuitive to suggest that a police officer's reasonable suspicions could actually *increase* to the level of probable cause based on the failure to find *anything* in three distinct searches conducted as part of an investigation.[10]

Finally, the dissent argues that the officers gained probable cause when one of the officers noticed that a panel was loose on the driver's door.[11] As discussed in the next section, we conclude the officers exceeded the scope of a *Terry* search when they searched the vehicle again after already having conducted a search of Flowers, a protective search of the vehicle, and a dog-sniff search of the vehicle for evidence of drugs.[12] We therefore conclude that the state has not met its burden to show that officers had probable cause to search the vehicle under the automobile exception to the Fourth Amendment.

B. *Terry* Search Exception

■ The state also argues that another exception to the warrant requirement is applicable in this case—the *Terry* search exception. We have summarized the holding of the United States Supreme Court in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) as follows: even in the absence of probable cause, the "police may stop and frisk a person when (1) they have a reasonable, articulable suspicion that a suspect might be engaged in criminal activity and (2) the officer reasonably believes the suspect might be armed and dangerous." *State v. Dickerson*, 481 N.W.2d 840, 843 (1992) (citing *Terry*, 392 U.S. at 30, 88 S.Ct. 1868), *aff'd*, 508 U.S. 366, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993). A *Terry* stop permits an officer who suspects that an individual is engaged in illegal activity and also believes that a suspect may be armed and dangerous to

10. Indeed, it is difficult to anticipate any factual situation where the police's failure to find a weapon or contraband in a *Terry* search, without any facts giving rise to additional suspicion in the meantime, would give the officers probable cause to conduct additional searches.

11. While it is not a crucial part of our analysis, our opinion is informed, in part, by the fact that the videotape shows several officers standing by the open driver's door, yet none of them apparently noticed that the panel on the door was loose.

12. The record is not clear as to what happened after the "K–9 unit cleared the vehicle." While one officer testified that he approached the vehicle, noticed that one panel was loose, and pulled it back "a little bit" to reveal the gun, the officer's partner was much less specific when asked what happened. The second officer stated, "I'm not quite sure exactly how that fell, who searched what and when, but eventually it was searched."

frisk the suspect in order to reduce concerns that the suspect poses a danger to officer safety. *See Adams v. Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) ("The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence * * *."). In Minnesota, we have held that the "principles and framework of *Terry* [apply when] evaluating the reasonableness of [searches and] seizures during traffic stops even when a minor law has been violated." *State v. Askerooth,* 681 N.W.2d 353, 363 (Minn.2004).

Specifically, we have said that an officer may conduct a "protective search of the passenger compartment of the vehicle, limited to those areas in which a weapon may be placed or hidden," if the officer has a "particularized and objective basis for suspecting the particular person stopped of criminal activity" and the officer "possesses a reasonable belief, based on specific and articulable facts, that the suspect is dangerous and may gain immediate control of a weapon." *State v. Waddell,* 655 N.W.2d 803, 809–10 (Minn.2003) (internal quotations omitted). Twenty years earlier, in *Michigan v. Long,* the Supreme Court held that:

> [T]he search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on "specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant" the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons.

463 U.S. 1032, 1049, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983) (quoting *Terry,* 392 U.S. at 21, 88 S.Ct. 1868).

We previously indicated in *Askerooth* that a two-step inquiry is appropriate when evaluating the reasonableness of a traffic stop. First, was the stop justified at its inception? *Askerooth,* 681 N.W.2d at 364. Second, were the actions of the police reasonably related to and justified by the circumstances that gave rise to the stop in the first place? *Id.* Related to the second inquiry, we have recognized that "Article I, Section 10 of the Minnesota Constitution requires that each incremental intrusion during a traffic stop be tied to and justified by one of the following: (1) the original legitimate purpose of the stop, (2) independent probable cause, or (3) reasonableness, as defined in *Terry.*" *Askerooth,* 681 N.W.2d at 365; *see also State v. Wiegand,* 645 N.W.2d 125, 135 (Minn.2002) ("Expansion of the scope of the stop to include investigation of other suspected illegal activity is permissible under the Fourth Amendment only if the officer has reasonable, articulable suspicion of such other illegal activity."). Here, it is undisputed that the officers were justified in stopping Flowers for a license-plate light violation. Thus, our focus is on the second step of the inquiry.

 Under the Minnesota Constitution, a police officer may not conduct a *Terry* search *solely* because an individual is driving a vehicle that does not have a functional license-plate light. *See Askerooth,* 681 N.W.2d at 363. Therefore, the issue before us is whether the expansion of the stop's scope was justified by a reasonable, articulable suspicion of illegal activity. We consider the totality of the circumstances when determining whether reasonable, articulable suspicion exists. *State v. Martinson,* 581 N.W.2d 846, 852 (Minn.1998). And we have noted that, by virtue of the special training they receive, police officers articulating a reasonable suspicion may make inferences and deduc-

tions that might well elude an untrained person. *Askerooth,* 681 N.W.2d at 369.

■ The district court concluded that the officers reasonably suspected illegal activity and reasonably feared for their safety because Flowers made "suspicious movements" and did not comply with attempts to pull him over. We agree that Flowers' movements in the vehicle, which lasted for approximately 45 seconds, gave the officers a reasonable suspicion that Flowers may have been involved in some type of criminal activity and that he might have been armed and dangerous.[13] Here, Flowers' movements in the vehicle gave the officers more than an "inchoate and unparticularized suspicion or 'hunch.'" *See Terry,* 392 U.S. at 27, 88 S.Ct. 1868. We therefore conclude that the officers had reasonable suspicion of some form of illegal activity and that Flowers might be armed and dangerous.

■ Having reached the conclusion that the police officers had a basis for conducting a *Terry* search, we must address a related inquiry—did the officers' actions exceed the permissible scope of a *Terry* search? We have said that "to be reasonable, any intrusion in a routine traffic stop must be supported by an objective and fair balancing of the government's need to search or seize and the individual's right to personal security free from arbitrary interference by law officers." *Burbach,* 706 N.W.2d at 488 (internal quotations omitted). We also note that the state has the burden to demonstrate that the *Terry* search was sufficiently limited in scope and duration. *See Askerooth,* 681 N.W.2d at 365 (noting that the state has the burden "to show that a seizure was sufficiently limited"); *see also Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality opinion) ("It is the State's burden to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.").

We have said that when the police have articulated a reasonable suspicion of criminal activity and that a suspect may be armed and dangerous, the police may conduct "a *carefully limited frisk* for weapons." *Dickerson,* 481 N.W.2d at 846 (emphasis added). The Supreme Court has similarly indicated that:

> [W]here a police officer observes unusual conduct which leads him reasonably to

---

**13.** We find support for this conclusion in a number of federal cases. *See United States v. Evans,* 994 F.2d 317, 321 (7th Cir.1993) ("The officers testified that upon their activation of the police lights and siren, the defendant leaned forward at a forty-five degree angle for several seconds, as to place or retrieve something under the seat. * * * We previously have relied on gestures similar to those of the defendant in finding that an officer reasonably feared for his safety."); *United States v. Fryer,* 974 F.2d 813, 819 (7th Cir.1992) ("The uncontroverted facts show that while patrolling a marginally safe neighborhood, in the wee hours of the morning, a veteran police officer observed a traffic violation. After signaling the car to pull over, the officer observed furtive movements between the driver and the passenger, as if they were passing something between them. * * * These are clearly the kind of specific, articulable facts that the standard contemplates and which warrant a search [under *Michigan v. Long* and *Terry v. Ohio*]."); *United States v. Nash,* 876 F.2d 1359, 1361 (7th Cir.1989) ("[The officer] testified that Nash made a 'furtive gesture' as the police car pulled up behind him. A reasonable interpretation of this 'furtive gesture' was that the defendant was hiding a gun, thus giving [the officer] cause to be concerned about his safety."); *see also United States v. Colin,* 928 F.2d 676, 678 (5th Cir. 1991) (holding that a "person * * * 'stooping down and moving from side to side' in the front seat of an automobile" may form the basis of a reasonable belief that a person is armed and dangerous, and justifies an officer's decision to frisk the person).

conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous * * * [the officer] is entitled for the protection of himself and others in the area to conduct a *carefully limited search* of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him. *Terry,* 392 U.S. at 30, 88 S.Ct. 1868 (emphasis added). The Eighth Circuit Court of Appeals has said that, when determining whether the police have exceeded the permissible scope of a *Terry* stop, courts should consider a number of factors, including:

> (1) the number of officers and police cars involved; (2) the nature of the crime and whether there is reason to believe the suspect might be armed; (3) the strength of the officers' articulable, objective suspicions; (4) the erratic behavior of or suspicious movements by the persons under observation; and (5) the need for immediate action by the officers and lack of opportunity for them to have made the stop in less threatening circumstances.

*United States v. Raino,* 980 F.2d 1148, 1149–50 (8th Cir.1992). Further, we have said that an officer's protective search of the passenger compartment of a vehicle must be "appropriately limited" to those areas in which a weapon may be placed or hidden. *Waddell,* 655 N.W.2d at 810; *see also Long,* 463 U.S. at 1049, 103 S.Ct. 3469 ("[T]he search of the passenger compartment of an automobile [must be] limited to those areas in which a weapon may be placed or hidden * * *.").

Based on the foregoing general principles, we conclude that the officers did not carefully and appropriately limit their response to the facts and circumstances of this case. We first note that when the officers initiated the stop, the only offense they knew Flowers had committed was driving a vehicle without a rear license-plate light.[14] The officers observed Flowers move around the passenger compartment of the vehicle and testified that they had reason to believe that he was armed, but they did not specifically observe any weapon or contraband. In short, while the officers had suspicions, the strength of their suspicions was not great.[15] After Flowers pulled over to the curb and stopped after having driven slowly through the alley, there were at least three squad cars on the scene. The officers ordered Flowers out of the vehicle at gunpoint, told him to walk backward toward the squad car, and ordered him to lie flat on his stomach with his arms and legs spread. The officers then handcuffed Flowers'

---

**14.** This fact is undisputed. We do not, as the dissent suggests, mean to imply that the police must have *known* that Flowers was involved in criminal activity or was armed and dangerous. We have always stated that reasonable suspicion is the appropriate standard under *Terry* principles. *See, e.g., Burbach,* 706 N.W.2d at 488; *Dickerson,* 481 N.W.2d at 843.

**15.** The dissent suggests we have written a "new rule" of law by recognizing that there are varying degrees of strength. But we have acknowledged this principle in the past. *See State v. Moffatt,* 450 N.W.2d 116, 119 (Minn.1990) (discussing the increase in "the degree of objective suspicion" that occurred because of the observations made by the officers during the course of a *Terry* stop). We find additional support in federal case law. *See Raino,* 980 F.2d at 1150 (considering "the strength of the officers' articulable, objective suspicions"). Here, where the officers did not observe any illegal activity other than a license-plate light violation and where the officers' suspicions were based on Flowers' furtive movements inside the vehicle, we conclude that the strength of the officers' suspicions—however reasonable—was not great.

hands behind his back. While Flowers was still lying on the pavement, one officer conducted a 35–second search of Flowers. This search did not uncover any weapons or contraband. Flowers was then confined to the back seat of a squad car.[16]

As Flowers was handcuffed and confined to the back seat of the squad car, the officers searched the vehicle.[17] Presumably, this search was motivated by concerns about officer safety and was based on the officers' belief that Flowers was "dangerous and may [have] gain[ed] immediate control of a weapon." *Waddell*, 655 N.W.2d at 810. An officer entered the vehicle and searched it for 30 seconds. This was not, as the dissent suggests, a brief or cursory search. Rather, the vid-

eotape indicates that the officer inspected both the front and back seats and also searched under the seats. This search of the vehicle failed to reveal any weapons. At this point, as the officers' testimony indicates, the officers believed "[t]he situation was under control," and they turned off the video camera.

Having satisfied their reasonable fears about the possibility that Flowers might have immediate access to a weapon and having concluded that the situation was under control, the officers' focus changed to illegal drugs. Specifically, the officers called a drug-sniffing dog to the scene to search the vehicle for odors of drugs. This search failed to reveal any contraband

---

16. In other circumstances, we have held that these actions exceed the scope of a *Terry* stop, and transform the stop into a de facto arrest. *See State v. Blacksten*, 507 N.W.2d 842, 846–47 (Minn.1993) ("Respondent was de facto under arrest from the time he was ordered to the ground at gunpoint, handcuffed, and placed in the squad car.").

This is not to say that the police can never take *any* of these actions in the course of a *Terry* stop. Rather, we determine the reasonableness of the officers' actions in light of the circumstances of this case. The dissent cites several cases in which we have indicated that it was reasonable for the police to (1) approach a suspect with weapons drawn, (2) order a suspect to lie on the ground before conducting a frisk, (3) handcuff a suspect, *or* (4) briefly confine the suspect to the back of a squad car. But we note that, of the cases cited by the dissent, (1) in *none* of the cases did the officers take *all* of the steps that the officers took in this case, (2) in *all* of the cases, the officers' suspicions were stronger than in this case, and (3) in *all* of the cases the nature of the suspected crime was more serious than what was suspected here—that Flowers was concealing a weapon or some form of contraband in the vehicle. *See State v. Munson*, 594 N.W.2d 128, 132, 137 (Minn. 1999) (describing a stop where, based on a tip from a confidential reliable informant that the defendant was transporting "a large amount of crack cocaine" in his vehicle, "the police

approached the Blazer with drawn guns, ordered the occupants out of the Blazer, handcuffed the occupants and frisked them for weapons, removed the handcuffs once it was determined that the occupants were not armed, and then placed the occupants in the back seat of squad cars while the police searched the Blazer"); *Moffatt*, 450 N.W.2d at 117–18 (describing a stop in which an officer, who after approaching the defendant's vehicle on foot suspected that vehicle's occupants might have been involved in a robbery, removed each of the men from the vehicle, one at a time, and placed them into separate squad cars—but there is no indication that the officer ordered the suspects out of the vehicle at gunpoint or handcuffed the suspects); *State v. Nading*, 320 N.W.2d 82, 84 (Minn.1982) (describing a stop where "the officers had strong grounds for suspecting that the men in the van and the Blazer were burglars who may well have committed another crime" and therefore reasonably ordered the suspects to the ground—but there is no indication that the suspects were also handcuffed or confined to the back of a squad car).

17. We also note that as Flowers was handcuffed and confined to the back seat of the squad car, the officers inspected the vehicle with their flashlights on at least three separate occasions. It is unclear how long the final flashlight inspection lasted.

hidden in the vehicle.[18]

Even if we were to assume that all of the actions taken by the officers to this point were permissible, we conclude that the officers impermissibly exceeded the scope of a *Terry* stop when—after their search of Flowers, their search of the vehicle, and the dog-sniff search of the vehicle—the officers returned to the vehicle and conducted another search which lasted for an unknown period of time. As a general rule, we note that once a *Terry* search "has determined that the suspect is not armed, the police may not without probable cause once again search the suspect." 4 Wayne R. LaFave, *Search & Seizure* § 9.6(b), at 663 (4th ed.2004) (footnote omitted). We have already concluded, in our discussion of the automobile exception to the Fourth Amendment, that the police did not have probable cause to search the vehicle in this case. But the state also argues that this search was justified based on the same reasonable suspicion that the officers had when they initially searched the vehicle. We are not persuaded by the state's argument. The reasonable suspicions the officers had when they searched Flowers and the vehicle had dissipated, and without more, the officers could not conduct another search of the vehicle based on the same suspicions.

There is support for this conclusion in our case law. In *State v. Payne*, we recognized that " '[i]f by investigation or happenstance the quantum of evidence needed to justify a forcible stop has dissipated * * *, then it is not permissible to frisk.' " 406 N.W.2d 511, 513 (Minn.1987) (quoting 3 Wayne LaFave, *Search and Seizure*

§ 9.4(a), at 502 (1987)). In *Payne*, we concluded that the officer's reasonable suspicion had not dissipated because the officer had simply "called in the names of the men and apparently learned that there were no warrants known to be outstanding." *Id.* at 514. Moreover, we suggested that the officer's suspicions might reasonably have increased between the time of the stop and the time he initiated the frisk because during that interval an additional officer appeared at the scene and said that his tracking dog had led him from the scene of the crime to that location. *See id.*

LaFave provides additional support for our conclusion. Although LaFave acknowledges that the police are "not necessarily" limited to one search based on a reasonable articulable suspicion, the only exception to this general rule that he acknowledges comes from *Balentine v. State*, 71 S.W.3d 763 (Tex.Crim.App.2002). 4 LaFave, *supra*, § 9.6(a), at 640–41 (4th ed.2004). In *Balentine*, an officer who was working alone stopped a person walking briskly away from the scene of a crime. 71 S.W.3d at 767. The officer conducted a *Terry* search of the person, but did not find any weapons. *Id.* After the initial search, the officer asked the suspect a series of questions and received contradictory answers. *Id.* Based on the suspect's contradictory answers, the officer conducted a second frisk of the person and found a bullet (which was later used to link the suspect to the crime). *Id.* at 768. The Texas court ruled that the suspect's contradictory answers gave the officer "heightened" suspicions, which justified the second frisk. *Id.* at 769–70.

---

18. It is possible to make an argument that the police had a reasonable, articulable suspicion of drug-related criminal activity, and that the search was therefore justified under *Wiegand*. 645 N.W.2d at 137. But we need not decide whether such a search was justified in this case because we conclude for other reasons that the gun must be suppressed because the police exceeded the scope of a permissible *Terry* search.

There are no circumstances in this case like those that were present in *Payne* or *Balentine*.[19] The officers had done far more than call in with Flowers' name—they had searched him, searched his vehicle, and conducted a dog-sniff search of the vehicle for narcotics. And there is nothing in the record, such as another officer arriving at the scene and reporting additional facts or increasingly suspicious behavior, that indicates that the officers' suspicions of illegal activity had actually increased.[20] Instead, *Payne* and *Balentine* lead us to conclude that, after conducting at least three searches without any facts giving them additional suspicion, the officers could not conduct another search of the vehicle based on the same suspicions they had when they searched the vehicle the first time.

For the officers to return to the vehicle and conduct another search, they must have reasonably suspected some other type of illegal activity and must have continued to reasonably fear for their safety.[21] The state has the burden to allege specific and articulable facts that establish that such objectively reasonable suspicion exists. *See State v. Sanders*, 339 N.W.2d 557, 560 (Minn.1983). Based on this record, we are not able to conclude that the state has satisfied its burden. The officers did not testify to specific and articulable facts that would objectively lead them to suspect some other type of illegal activity after they had conducted the dog-sniff search. There is no indication in the record that, in the interval between the initial search of the vehicle and the time the officers returned to the vehicle to search it again (or at any time before they found the gun), the officers learned that Flowers was a person who was not entitled to possess a firearm. Accordingly, we conclude that it is not plausible to believe that during that interval the officers gained a reasonable suspicion that Flowers might have been illegally possessing a firearm.

Additionally, we are unable to conclude on this record that the officers could have continued to reasonably fear for their safety. To the contrary, Flowers had complied with all of the officers' orders, and

19. The dissent contends that this case is similar to *Balentine* because Flowers' "statements contradicted what the officers had observed." But the dissent fails to note the crucial distinction between this case and *Balentine*. In *Balentine*, the officer received "contradictory answers" to his questions *after* he had already conducted an initial search. 71 S.W.3d at 767, 769. Therefore, in *Balentine* the "heightened" suspicions arose *after* the initial search. Here, Flowers' answers to the police questions came *before* the initial search of the vehicle. Thus, as we have acknowledged, the officers may have had a reasonable suspicion *before* they conducted their initial search of the vehicle, but the record does not indicate that any facts arose *after* the officers' initial search of the vehicle that would have increased the officers' objective suspicions.

20. The dissent would hold that the "absence of evidence serve[s] to enhance the officers' suspicions." But the officers did not testify that their suspicions grew because they found nothing in the vehicle that would have explained Flowers' movements. Instead, when one of the officers was asked if he observed any paperwork or license registration on the seat of the car, the officer testified that he did not remember. Therefore, we conclude that the state has not met its burden to allege specific and articulable facts that establish that an objectively reasonable suspicion exists. *See State v. Sanders*, 339 N.W.2d 557, 560 (Minn.1983) (citing several cases applying this standard).

21. This case is not, as the dissent asserts, about taking "too long to find the gun." Rather, it is about a *Terry* search and police officers' reasonable suspicions and reasonable fears for their safety. Where, as here, those reasonable suspicions and fears had dissipated, the officers cannot, without more, conduct another search of the suspect or the vehicle that he was driving.

the officers failed to find any weapons in their searches. These facts dispelled any reasonable fear the officers had for their safety. *See Terry*, 392 U.S. at 30, 88 S.Ct. 1868 (noting that an officer's stop and frisk may continue only so long as "nothing in the initial stages of the encounter serves to dispel [the officer's] reasonable fear for his own or others' safety"). Our conclusion is based on facts in the record. The officers did not testify that they continued to fear for their safety, and the officers' actions suggest they were no longer concerned for their safety. For instance, one of the officers testified that the officers turned off the video camera that was recording the stop because "[t]he situation was under control." Additionally, the officers shifted the focus of their searches from weapons to illegal drugs when they called a drug-sniffing dog to the scene. Moreover, there were at least three squad cars and five officers at the scene, making this case distinguishable from a case where an officer acting alone might need to take additional precautions.

■ This case is also distinguishable from *Long* and *State v. Gilchrist*, 299 N.W.2d 913 (Minn.1980). In *Long*, the officers had actually seen a weapon in the vehicle that the suspect might have used against them. 463 U.S. at 1036, 103 S.Ct. 3469. Here, the officers had seen nothing in their previous searches that would have confirmed or increased their fears for safety. And in *Gilchrist*, the officers had, as the dissent recognizes, "knowledge of the suspect involved in that case." That knowledge, derived from a police bulletin, included information that (1) the suspect was suspected of homicide, (2) he owned a .357 revolver, and (3) he may have been armed and dangerous. *Gilchrist*, 299 N.W.2d at 914. Here, as previously noted, there is no evidence in the record suggesting that the officers had any knowledge of Flowers' status as a person who was not entitled to possess a firearm.[22] The officers may have had a remaining hunch that when they released Flowers, he might have had access to a gun at some point. But their search of Flowers and their search of the vehicle dissolved the notion that such access would be immediate.[23]

The officers, however, did not stop after searching Flowers, searching the vehicle, and conducting the dog-sniff search. Instead, the officers returned to the vehicle and conducted another search. We conclude that the officers exceeded the per-

---

**22.** The remaining cases cited by the dissent are also distinguishable on their facts. *See United States v. Holmes*, 376 F.3d 270 (4th Cir.2004); *State v. Wausnock*, 303 A.2d 636 (Del.1973); *State v. Vandenberg*, 134 N.M. 566, 81 P.3d 19 (2003); *State v. Smith*, 66 Or.App. 516, 674 P.2d 1206 (1984); *State v. McGill*, 234 Wis.2d 560, 609 N.W.2d 795 (2000). Moreover, in none of the cases cited by the dissent did the officers involved conduct an initial search of a vehicle and then return to the vehicle to conduct another search.

**23.** We must acknowledge that the officers' instincts were correct—Flowers would have had access to the gun in the vehicle. But an officer's suspicions about future conduct do not justify a *Terry* search; instead, the concerns must relate to an *immediate* danger.

*See Long*, 463 U.S. at 1049, 103 S.Ct. 3469; *see also Terry*, 392 U.S. at 30, 88 S.Ct. 1868 (holding that a police officer may frisk a person who the officer reasonably concludes is involved in criminal activity and "may be armed and *presently* dangerous" (emphasis added)). Further, the fact that the officers ultimately found a gun in the vehicle cannot justify the officers' decision to return to the vehicle and search it again. The police must have adequate grounds to conduct a search before they search—the ends cannot justify the means in this type of case. *See State v. Henning*, 666 N.W.2d 379, 386 (Minn.2003) ("We have never before simply allowed the ends to justify the means when the means void our citizens' constitutional protections.").

missible scope of a *Terry* search when they conducted this search. There is no indication in the record of how long this search lasted or how thorough it was. The record does indicate, however, that during this search, the officers partially dismantled the vehicle by pulling the driver's door panel back from the door frame and lifting the power-window control mechanism from the armrest of the door.

Under the totality of these facts and circumstances, we conclude that the state has not met its burden of proving that this *Terry* search was appropriately limited in scope. To hold otherwise would be to say, in essence, that based on an officer's initial reasonable suspicion of criminal activity and reasonable fear that a suspect is armed and dangerous, the officer may detain the suspect for any length of time and there is no limit to the number of searches that the officer may conduct—both of the suspect and of the vehicle he was driving. *See* 4 LaFave, *supra,* § 9.2(f), at 337 (4th ed. 2004) ("There is no general rule that the detention may continue so long as the reasonable suspicion giving rise to the stop remains, for if this were the rule some stops could be continued indefinitely."). The Minnesota Constitution does not allow us to reach such a holding.

Finally, while we are confident that a federal court analyzing this case using only the *Terry* framework would reach the same conclusion, we are uncertain, in light of *Atwater v. City of Lago Vista,* 532 U.S. 318, 121 S.Ct. 1536, 149 L.Ed.2d 549 (2001), whether a federal court might conclude that because the officers had probable cause to stop Flowers based solely on the license-plate light violation, the subsequent searches were justified as searches incident to arrest. *See, e.g., United States v. Childs,* 277 F.3d 947, 953 (7th Cir.2002) ("[T]raffic stops supported by probable cause are arrests, with all the implications that follow from probable cause to believe that an offense has been committed."); *see also Atwater,* 532 U.S. at 354, 121 S.Ct. 1536 ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender.").

In *Askerooth,* we noted that "Atwater's sharp departure from our traditional understanding of the protections from unreasonable seizure" provided a principled basis to interpret our state constitution differently. 681 N.W.2d at 362–63. We concluded in *Askerooth* that our state constitution does not allow police officers to arrest and search individuals solely because a minor traffic law has been violated. *Id.* at 363. Rather, we stated that we follow "the principles and framework of *Terry* [when] evaluating the reasonableness of [searches and] seizures during traffic stops." *Id.* Using those principles (as developed in both Minnesota and federal case law) in this case, we have concluded that Flowers' rights under our state constitution were violated, and therefore we need not address the issue of whether Flowers' rights under the federal constitution were violated.

For all of the foregoing reasons, we hold that the district court erred when it denied Flowers' motion to suppress the use of the gun as evidence.[24]

24. In so holding, we do not, as the dissent suggests, write a new rule of law that if the police conduct a protective search "they must hunt until they find the weapon or contraband before leaving the passenger compartment because they will not be permitted to reenter, or even apparently reapproach the vehicle." Rather, we are guided by the critical, long-standing concept in constitutional law that requires courts to balance the invasion of an individual's right to personal liberty against the government's need to conduct a

## II.

 Flowers next argues that the district court erred when it ruled that he could be impeached with a prior conviction. We review a court's ruling on the admissibility of prior convictions for impeachment of a defendant under a clear abuse-of-discretion standard. *State v. Swanson,* 707 N.W.2d 645, 654 (Minn.2006).

 Evidence that a witness has been convicted of a felony is admissible for impeachment purposes if the probative value of the evidence outweighs its prejudicial effect. Minn. R. Evid. 609(a)(1). When considering the admission of a prior offense for impeachment purposes, a district court should demonstrate on the record that it has considered and weighed the factors we set forth in *Jones,* 271 N.W.2d at 537–38. *See Swanson,* 707 N.W.2d at 654–55. Specifically, a court should examine

(1) the impeachment value of the prior crime, (2) the date of the conviction and the defendant's subsequent history, (3) the similarity of the past crime with the charged crime (the greater the similarity, the greater the reason for not permitting use of the prior crime to impeach), (4) the importance of defendant's testimony, and (5) the centrality of the credibility issue.

*Jones,* 271 N.W.2d at 538.

Although there are nine pages in the hearing transcript where the parties discussed impeachment by the prior conviction, the district court did not make a record indicating that it considered the *Jones* factors when it ruled that Flowers could be impeached with the prior conviction. The court simply stated: "On the issue of impeachment by a prior conviction, the Court is going to permit the impeachment by the prior conviction if the defendant decides to take the stand."

We conclude that the district court erred when it failed to make a record that it specifically considered and weighed the *Jones* factors. Here, the discussion of the *Jones* factors with counsel on the record does not sufficiently demonstrate that the court weighed and considered the *Jones* factors when it ruled on this issue. *See Swanson,* 707 N.W.2d at 655. Because we are reversing and remanding this case on other grounds, we need not independently review the *Jones* factors to determine whether the court's error was harmless. *See id.* However, we instruct the court on remand to specifically address these factors so that the record reflects that they were considered and we can properly assess them if there is a subsequent appeal.

## III.

 Flowers also argues that after the state elicited testimony that the gun was stolen, the district court erred when it denied his motion for a mistrial. We review a court's denial of a motion for mistrial for an abuse of discretion. *State v. Manthey,* 711 N.W.2d 498, 506 (Minn. 2006).

Before trial, Flowers made a motion in limine to "preclude any reference to [the gun] being stolen." The state agreed not to make any inquiries into whether the gun was stolen, and the district court prohibited the state from eliciting such testimony. In spite of the court's ruling, an officer testified at trial that he found a "stolen" gun when he was searching the vehicle. The state acknowledged that the officer's

search in the interest of preserving a secure and civil society. *See, e.g., Long,* 463 U.S. at 1046, 103 S.Ct. 3469; *Burbach,* 706 N.W.2d at 488. We continue to read our state consti- tution as placing limits on the scope of a *Terry* search based on the totality of the circumstances. *See Burbach,* 706 N.W.2d at 488.

testimony was improper, informed the court that it had discussed the court's limitation on stolen-gun testimony with the officer before he testified, and specifically instructed the officer not to mention the fact that the gun was stolen. Based on the record before us, there is no reason to question the court's finding that the state properly prepared its witness and that the officer unintentionally revealed that the gun was stolen.

Because we are reversing and remanding on other grounds, we need not decide whether the district court abused its discretion when it denied Flowers' motion for a mistrial. We have previously noted, however, that we will not hesitate to order a new trial when the state, intentionally or unintentionally, elicits information ruled to be inadmissible and we conclude that information is prejudicial to the defendant. *See State v. Haglund*, 267 N.W.2d 503, 506 (Minn.1978) ("[E]ven when the elicitation is unintentional, we will reverse if the evidence is prejudicial.").

## IV.

Flowers also argues that the district court erred in its response to a question from the jury after the jury began its deliberations.[25] He makes two specific arguments. First, he contends that the court's answer to the question was an incorrect statement of the law. In other words, he contends that the state must prove beyond a reasonable doubt that Flowers *knowingly* possessed the gun, and the state has not met its burden if it proves only that the gun was in a place under Flowers' exclusive control to which other people did not normally have access.

Second, Flowers argues that even if the district court's answer to the question was an accurate statement of the law, the instruction was erroneous because it was an improper inference instruction. This second argument is based on our decisions in *State v. Olson*, 482 N.W.2d 212 (Minn. 1992), and *State v. Litzau*, 650 N.W.2d 177 (Minn.2002).

The district court initially instructed the jury that to be found guilty of possession Flowers must either have

> knowingly possessed a pistol or other firearm or knowingly exercised dominion and control over it.[26]

The court then instructed the jury:

> A person possesses a pistol or a firearm if it is on his or her person. A person also possesses a pistol or a firearm if it was in a place under his or her exclusive control to which other people did not normally have access or if the person knowingly exercised dominion and control over it.[27]

Based on this latter instruction, the jury presumably wondered if the state had met

---

25. Flowers did not make a formal objection to the additional instruction. Indeed, defense counsel helped craft the additional instruction and dictated it to the district court judge. But Flowers made a record in court that his request was that the jury simply be told that knowledge is required for possession. The state has therefore conceded that Flowers has properly preserved this issue for appeal.

26. *See* 10A Minn. Dist. Judges Ass'n, *Minnesota Practice—Jury Instruction Guides, Criminal,* CRIMJIG 32.21 (5th ed.2006).

27. *See id.,* CRIMJIG 32.42 (citing to *State v. Florine,* 303 Minn. 103, 105, 226 N.W.2d 609, 611 (1975), which states: "[I]n order to prove constructive possession the state should have to show (a) that the police found the substance in a place under defendant's exclusive control to which other people did not normally have access, or (b) that, if police found it in a place to which others had access, there is a strong probability (inferable from other evidence) that defendant was at the time consciously exercising dominion and control over it.").

its burden by proving that the gun was found in a place under Flowers' exclusive control to which other people did not normally have access. The jury thus asked:

> The [instruction] states the defendant must *knowingly* possess the firearm, or knowingly exercise control over it. However, the definition of possession does not appear to require knowledge of the firearm if it was in a place under his exclusive control. Is *knowledge* required for the defendant to be guilty?

The court's answer was:

> Knowledge is required for possession. Knowledge may be inferred if the firearm was in a place under his exclusive control to which other people did not normally have access.

We agree with Flowers that the district court's answer was an improper inference instruction. We are unable to distinguish the additional instruction given in this case from the instructions given in *Olson*, 482 N.W.2d at 215, and *Litzau*, 650 N.W.2d at 186 n. 8. In *Olson*, the defendant was at a house that apparently did not belong to him when he was arrested pursuant to an outstanding warrant. *Id.* at 213. No one else was present in the house at the time of the defendant's arrest. *Id.* at 213–14. The officers asked the defendant if he wanted to put on additional clothes before going to the police station. *Id.* at 213. The defendant said yes, and led the officers into the house. *Id.* Once inside the house, the officers observed marijuana, a vacuum sealer, and other drug paraphernalia. *Id.* The defendant was subsequently charged with possession of a controlled substance. *Id.* at 214. At trial, the court read the following instruction, using the language of Minn.Stat. § 152.028, subd. 1 (2006):

> The presence of a controlled substance in open view in a room, other than a public place, under circumstances evincing an intent by one or more of the persons present to unlawfully mix, compound, package, or otherwise prepare for sale the controlled substance *permits the factfinder to infer knowing possession* of the controlled substance by each person in close proximity to the controlled substance when the controlled substance was found.

*Olson*, 482 N.W.2d at 215 (emphasis added).

In *Olson*, we held that the district court's instruction was improper, and said that instructions on inferences "should be avoided as much as possible." *Id.* (internal quotation omitted). We noted that such instructions are often unnecessary and "undesirable in that they tend to inject argument into the judge's charge and lengthen it unnecessarily." *Id.* (citing *Manual of Model Criminal Jury Instructions for the Ninth Circuit* 48 (1989 ed.)). We concluded that the instruction in *Olson* "was improper because it was not a balanced instruction on the various relevant factors bearing on the jury's determination of the disputed possession issue." *Id.* at 216. Instead, we said the instruction "singled out and unfairly emphasized one factor, one piece of the circumstantial evidence, bearing on that determination, thereby suggesting to the jury that in the court's opinion that factor was of greater importance than other relevant factors." *Id.* We also pointed out that the instruction did not inform the jury that it "was *not required* to infer that the defendant knowingly possessed any marijuana in open view." *Id.* Therefore, in *Olson*, we reversed the conviction and remanded the case for a new trial. *Id.*

*Litzau* involved a defendant who was stopped by the police while he was in a

motor vehicle. 650 N.W.2d at 180.[28] After a dog sniffed around the vehicle, the officers discovered drugs under the hood. *Id.* at 180–81. The district court gave the jury the following instruction, derived from Minn.Stat. § 152.028, subd. 2 (2006):

> In determining whether or not it has been proven beyond a reasonable doubt that the defendant was in knowing possession of methamphetamine, you should consider all the evidence presented. The law allows, but does not require, you to find knowing possession from proof beyond a reasonable doubt that the defendant was the driver or in control of a passenger automobile and the methamphetamine was present in the automobile. If you so find beyond a reasonable doubt, you may, but are not required to, find that the defendant knowingly possessed methamphetamine.

650 N.W.2d at 186 n. 8.

In *Litzau,* we reiterated our admonition that jury instructions indicating that a particular fact may be inferred from other particular facts, if proved, should be avoided. *Id.* at 185–86. We said that the permissive instruction improperly "allowed the jury to infer knowing possession of the controlled substance from two isolated facts: that the defendant was the driver and that methamphetamine was concealed in the body of the vehicle." *Id.* at 186. Therefore, we concluded that the instruction was an intrusion on the jury's deliberative process "because it effectively told the jury in this case that the judge thought there was sufficient evidence for a conviction." *Id.* We went on to conclude that "[b]ecause the instruction focused the jury on two isolated facts, the instruction suggested that the jury could convict without consideration of all of the evidence; and under these circumstances, submission of the instruction was plain error." *Id.* at

187. We reversed Litzau's conviction and remanded his case for a new trial. *Id.*

The state argues that the instruction given by the district court in its answer to the jury's question is distinguishable from the instructions given in *Olson* and *Litzau* because the additional instruction here came in response to a jury question. In essence, the state contends that by asking the question the jury was requesting permission to make the inference. We agree with the state that because the instruction was given in response to a jury question, this case is different from *Olson* and *Litzau.* In our view, however, this distinguishing fact only makes it more important that we ensure that the answer given to the jury was an appropriate one.

We conclude that the district court failed to properly inform the jury that any inference was permissive, and failed to instruct the jury that it was not required to accept that the inference necessarily followed from the facts. *See Olson,* 482 N.W.2d at 216 ("[T]he instruction did not even expressly inform the jury that the inference did not necessarily follow-that is, that the jury was *not required* to infer that the defendant knowingly possessed any marijuana in open view."). The court's instruction may have indicated to the jury that the court thought there was sufficient evidence for conviction. *See Litzau,* 650 N.W.2d at 186. Therefore, we hold that the court erred when it gave the additional instruction. But we conclude that we need not take the next step of conducting a harmless error analysis of the court's erroneous instruction because we are reversing and remanding on other grounds.

For all of the aforementioned reasons, we reverse and remand to the district court for a new trial.

Reversed and remanded.

---

28. Unlike in this case, Litzau owned the vehicle. 650 N.W.2d at 181.

ANDERSON, PAUL H., J. Concurring, ANDERSON, G. BARRY, J. Concurring in part, dissenting in part, GILDEA and ANDERSON, RUSSELL A., JJ.

ANDERSON, G. BARRY, Justice (concurring).

I join in parts II, III, and IV of the Court's opinion and concur as to the result in part I of the opinion.

GILDEA, Justice (concurring in part, dissenting in part).

I agree with the majority that this case should be reversed and remanded for a new trial, but I dissent from the majority's conclusion that the gun should be suppressed.[29] I would hold that the police officers' actions were reasonable and diligent, and supported by probable cause.

Before directly addressing the majority's legal analysis, a brief synopsis of the evidence is necessary. Flowers' car came to the attention of Minneapolis police on a city street in south Minneapolis, at night,[30] because the rear license plate on his car was not illuminated as required by law. The officers therefore attempted to stop Flowers. They activated their emergency lights and a spot light on their squad car.

Flowers did not stop, but turned into an alley.[31] The police followed, lights flashing. Flowers still did not stop.

The police next sounded their air horn. Flowers still did not stop. The police sounded the air horn again, but Flowers still did not stop.

The police then turned on the siren in their squad car. Even though the squad car lights were flashing and its siren was blaring continuously, Flowers continued to drive down the alley. The squad car followed right behind.[32]

There were two officers in the squad car following Flowers: Officer Hoff, who had about 20 years of experience as a police officer, and Officer Reynolds, who had about 25 years of experience in law enforcement. When Flowers did not immediately stop in response to these officers' efforts, choosing instead to turn into an alley, the officers aimed their squad's spot light directly into Flowers' car. Thus, they were able to see Flowers "frantically" moving about the interior of his car in response to the officers' escalating signals for him to stop. Officer Hoff testified that he saw Flowers moving as though he were "trying to take [the driver's door] apart," and that he saw Flowers "raising his hand [and] manipulating the door."

Informed by his 20 years of experience, the first thing Officer Hoff thought was that Flowers had a gun. He explained: "Because in my experience, when somebody is acting like that, displaying that

---

29. I would reverse and remand for a new trial because of the erroneous inference instruction, which I cannot conclude was harmless error on this record.

30. The district court, chambered in Minneapolis, apparently took judicial notice of the fact that the neighborhood in which the police stopped Flowers was a high-crime area.

31. Officer Hoff explained that Flowers did not stop in response to the squad car's emergency lights. Instead, Officer Hoff testified, Flowers "turned northbound in the alley from 43rd."

32. It is a misdemeanor for a person "to willfully fail or refuse to comply with any lawful order or direction of any peace officer invested by law with authority to direct, control, or regulate traffic." Minn.Stat. § 169.02, subd. 2 (2006); see also Minneapolis, Minn., Code of Ordinances § 466.130 (2006) (prohibiting identical conduct). Yet the majority seemingly wants to justify Flowers' behavior as taken out of concern that if he stopped his car as directed, Flowers would be blocking the alley. There is no evidence in the record to support that Flowers had any such concern.

type of behavior, they are either reaching for a gun or hiding a gun or contraband, but the first thing I'm thinking about is a gun." This testimony was corroborated by the testimony of Officer Reynolds.

## I.

The majority holds that what the officers observed gave them a reasonable suspicion of two things: (1) that Flowers might be "armed and dangerous," and (2) "that Flowers may have been involved in some type of criminal activity." I agree. This reasonable suspicion allowed the officers to detain Flowers and to continue the detention so long as the basis for the reasonable suspicion for the detention remained, provided they acted diligently and reasonably. *See State v. Wiegand*, 645 N.W.2d 125, 135 (Minn.2002). We have instructed officers that in the context of such detentions they should proceed incrementally with their investigation. *See State v. Askerooth*, 681 N.W.2d 353, 365 (Minn.2004) ("Article I, Section 10 of the Minnesota Constitution requires that each incremental intrusion during a traffic stop be tied to and justified by one of the following: (1) the original legitimate purpose of the stop, (2) independent probable cause, or (3) reasonableness, as defined in *Terry*."). The officers proceeded in just such an incremental fashion in this case.[33]

Before our decision today, there was support for each incremental step that the police officers took in this case to investigate their reasonable suspicion in a safe and secure manner. Our case law indicates that it was reasonable for the officers to approach Flowers with their weapons drawn. *See State v. Munson*, 594 N.W.2d 128, 137 (Minn.1999) ("We have recognized in the past that [i]f an officer making a reasonable investigatory stop has cause to believe that the individual is armed, he is justified in proceeding cautiously with weapons ready." (internal quotation omitted)). It was reasonable for the officers to frisk Flowers. *See State v. Dickerson*, 481 N.W.2d 840, 843 (Minn.1992), *aff'd*, 508 U.S. 366, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993) ("Because the stop was valid under *Terry*, police were justified in frisking the defendant if they reasonably suspected he could be armed and dangerous."); *see also Pennsylvania v. Mimms*, 434 U.S. 106, 110, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) (recognizing the "inordinate risk confronting an officer as he approaches a person seated in an automobile"). It was reasonable for the officers to have Flowers lie on the ground while they conducted the frisk. *State v. Nading*, 320 N.W.2d 82, 84 (Minn. 1982) ("We believe that the officers acted reasonably in requiring defendant and Williams to lie on the ground during the time their identified and suspicious conduct were being investigated."). It was reasonable to make a protective search of the interior of the vehicle. *State v. Waddell*, 655 N.W.2d 803, 810 (Minn.2003) ("A protective search of the passenger compartment of the vehicle, limited to those

---

**33.** The majority miscasts the standard by noting that "when the officers initiated the stop, the only offense they knew Flowers had committed was driving a vehicle without a rear license-plate light." Of course, knowledge is not the standard, reasonable suspicion is the relevant standard. The majority also incorrectly assumes that the only violation of law about which the police were concerned was Flowers' driving without a light over his license plate. The police may have also suspected that Flowers was carrying a weapon without a permit in violation of Minn.Stat. § 624.714, subd. 1a (2006), or transporting a loaded, uncased gun in violation of Minn.Stat. § 97B.045, subd. 1 (2006). In short, once Flowers chose not to stop, but to drive down the alley to buy himself time to hide something from the police who were trying to stop him, this case became about much more than a broken license-plate light.

areas in which a weapon may be placed or hidden, is permissible if the officer possesses a reasonable belief, based on specific and articulable facts, that the suspect is armed and dangerous."); *see also Michigan v. Long*, 463 U.S. 1032, 1049, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983). Finally, it was reasonable for the police to handcuff Flowers and have him wait in their squad car while they continued their investigation. *Munson*, 594 N.W.2d at 137 ("[B]riefly handcuffing a suspect while the police sort out the scene of an investigation does not per se transform an investigatory detention into an arrest, nor does placing the suspect in the back of a squad car while the investigation proceeds."); *State v. Moffatt*, 450 N.W.2d 116, 120 (Minn. 1990) (noting that requiring a defendant to sit in a police car for a short time does not take the situation beyond the realm of an ordinary traffic stop). The majority refuses to say which of these incremental steps authorized by our precedent was unnecessary to protect officer safety in this case. It likewise does not inform police how they might more reasonably ensure their safety while they conduct an investigation of a person the majority agrees the police reasonably believed was "armed and dangerous," and who the police, according to the majority, reasonably believed was engaged in criminal activity.[34]

Because the officers suspected that Flowers was hiding drugs, it was also reasonable for them to walk a narcotics-detection dog around the vehicle. *See Wiegand*, 645 N.W.2d at 135. As Officer Hoff testified, "because of his actions, what we think of [is] guns or drugs, some type of contraband. The individual was definitely trying to hide something or grab something, so we were going to have the K–9 check it out first."

When the dog ruled out drugs, the officers quite reasonably believed Flowers had hidden a weapon. Officer Hoff returned to the area of the car he had seen Flowers manipulate—the driver's door. As he explained,

> Then I approached the vehicle. The driver's door was still opened when I was walking up there. I could see that a portion; a panel on the driver's door, the lower left part opposite the hinges; was loose. It had a little gap in it * * * [b]ut because this driver was manipulating the door, I keyed on the door because it was apart.

It was at this point that the officer found the gun.

The majority, in essence, finds that it took the officers too long to find the gun, and therefore, they exceeded the scope of a *Terry* stop.[35] The majority does not

---

**34.** Instead, the majority cites *State v. Blacksten*, 507 N.W.2d 842 (Minn.1993), a case about an arrest. *Blacksten* is inapposite to this case. Unlike the officers here, the officer who made the stop in *Blacksten* "had no intention of conducting any investigation." *Id.* at 846. The majority also attempts to dismiss the precedent discussed above because (1) these cases authorize each individual action the police took in this case but not all of the steps taken together, (2) the officers' suspicions in these cases were "stronger" than in this case, and (3) the crimes suspected in these cases were "more serious" than that at issue here. Given that our precedent (before today) instructed police to proceed incre-

mentally, that the officers observed Flowers trying to hide something from them as he continued to drive after the police tried to stop him, and that they suspected Flowers to be carrying a gun in a motor vehicle on a city street at night, the distinctions the majority draws are ones without any meaningful difference.

**35.** The majority makes much of the fact that it is unknown exactly how long the officers searched the vehicle before they found the gun. But Flowers has not argued that the police exceeded the permissible *duration* of a *Terry* stop—he has only argued that the police exceeded the permissible *scope* of a *Terry*

conclude, however, that the police exceeded the scope of a permissible *Terry* stop through the conduct up to and including the use of the dog. Instead, the majority holds that the police went too far in returning to the car after the dog revealed that Flowers had not hidden drugs. Thus, the majority must acknowledge that the 30–second interior search of the car (which occurred simultaneously with the frisk of Flowers and before the dog sniff) was reasonable as a protective search. *Waddell,* 655 N.W.2d at 810; *see also Long,* 463 U.S. at 1049, 103 S.Ct. 3469. The majority basically writes a new rule of law instructing officers that if they conduct a protective search under *Waddell,* they must hunt until they find the weapon or contraband before leaving the passenger compartment because they will not be permitted to reenter, or even apparently reapproach, the vehicle. But this rigid and inflexible new rule of law is inconsistent with our earlier instruction that police should proceed incrementally. *See Askerooth,* 681 N.W.2d at 365. This type of categorical rule has also been rejected elsewhere. *See United States v. Osbourne,* 326 F.3d 274, 278 (1st Cir.2003) (rejecting the defendant's proposed "categorical rule: that a second pat-frisk is *per se* unreasonable in the absence of evidence that the first frisk was cursory or that the subject of the frisk had an opportunity to arm himself in the interim" and concluding that the reasonableness of a subsequent frisk must be determined based on the circumstances of each individual case); *see also* 4 Wayne R. LaFave, *Search & Seizure* § 9.6(b), at 663 n. 210 (4th ed. 2004) ("Sometimes the initial frisk will be inconclusive, justifying another."). I likewise would not apply such a rule in this case.[36]

Not only did it apparently take the officers too long to find the gun, but the majority also concludes that at the time the gun was found the officers no longer had a reasonable basis to believe Flowers

stop. Moreover, we have rejected strict time limits as the test for determining the reasonableness of police conduct. *Moffatt,* 450 N.W.2d at 119 ("Sometimes a 20–minute detention will be too long, sometimes a detention of more than an hour will not be unreasonable. * * * The fact that the police in a given case might have investigated the case in a different way arguably taking less time does not mean that the police acted unreasonably.").

**36.** The majority decides that Flowers' rights under the Minnesota Constitution were violated because the officers returned to the car after the dog sniff. But the majority does not articulate a "principled basis" for the conclusion that the Minnesota Constitution should be interpreted more broadly than the United States Constitution within the context of examining whether the police exceeded the scope of a permissible *Terry* stop. *See Askerooth,* 681 N.W.2d at 362. We recently noted that "[l]ooking to the state constitution as an independent basis for individual rights is a task we approach with restraint and some delicacy, especially when the right at stake is

guaranteed by identical or substantially similar language in the federal constitution." *State v. Anderson,* 733 N.W.2d 128, 2007 WL 1704119, at *10 (Minn. June 14, 2007) (internal quotation omitted). The majority relies on *Askerooth* for its decision to interpret the Minnesota Constitution more broadly than the federal constitution. *Askerooth* does not answer the question in this case. We are not dealing with the question of whether the constitution protects against an arrest made in the context of minor traffic violation (something the federal constitution permits, but our state constitution prohibits after *Askerooth* ). *See* 681 N.W.2d at 371. Here we address the permissible scope of a *Terry* stop, a concept that is drawn from the federal constitution. *See Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). That the U.S. Supreme Court might someday make a sharp and radical departure from its jurisprudence applying *Terry* principles should not provide a basis for us to look to the Minnesota Constitution. It seems to me that today it is this court that is making the sharp and radical departure from well-established *Terry* principles.

was armed and dangerous. Because of its assumption that officer safety could no longer be an issue with five officers on the scene and Flowers locked in the back of one of the squad cars, the majority concludes that the officers' actions exceeded the scope of a permissible *Terry* stop. But the majority's new rule would mean that officers may continue to pursue an investigation only if they continue to fear for their safety. Such a rule is inconsistent with *Terry* itself, which recognizes that officers should "neutralize" their concerns about safety before they investigate. *See Terry v. Ohio*, 392 U.S. 1, 24, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). As the Court aptly noted there: "Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties. American criminals have a long tradition of armed violence, and every year in this country many law enforcement officers are killed in the line of duty, and thousands more are wounded." *Id.* at 23, 88 S.Ct. 1868.

Moreover, in *Michigan v. Long* the U.S. Supreme Court specifically rejected as "mistaken in several respects" the same rationale the majority follows in arriving at its rule. *See* 463 U.S. at 1051, 103 S.Ct. 3469. In *Long,* officers observed the defendant's car proceeding in an erratic manner and at an excessive rate of speed. *Id.* at 1035, 103 S.Ct. 3469. The officers saw the car swerve into a ditch, and they approached to investigate. *Id.* When they got to the scene, the defendant, who appeared to be under the influence, was outside and standing near the rear of his car. *Id.* at 1035–36, 103 S.Ct. 3469. They asked him for the vehicle registration and as he went back to his car to retrieve it, the officers followed, looked in and saw a hunting knife on the floor of the driver's

side of the car. *Id.* at 1036, 103 S.Ct. 3469. While the defendant stood at the rear of the car with one officer, the other officer looked through the car with his flashlight to search for weapons. *Id.* He noticed something protruding from the armrest, went inside the car to investigate, and saw what appeared to be marijuana on the front seat. *Id.*

The Michigan Supreme Court suppressed the drugs holding "that it was not reasonable for the officers to fear that Long could injure them, because he was effectively *under their control* during the investigative stop and could not get access to any weapons that might have been located in the automobile." *Id.* at 1051, 103 S.Ct. 3469 (emphasis added). The Supreme Court reversed holding that the officers' actions were reasonable. *Id.* at 1035, 103 S.Ct. 3469. That the suspect was "under the brief control of a police officer," was not dispositive because "if the suspect is not placed under arrest, he will be permitted to reenter his automobile, and he will then have access to any weapons inside." *Id.* at 1051–52, 103 S.Ct. 3469. Rather than the bright line rule of "control" adopted by the Michigan Supreme Court, the Supreme Court reiterated that assessing the reasonableness of officers' actions is determined by " 'balancing the need to search [or seize] against the invasion which the search [or seizure] entails.' " *Id.* at 1046, 103 S.Ct. 3469 (quoting *Terry,* 392 U.S. at 21, 88 S.Ct. 1868). Applying that balance, the Court upheld as reasonable the officers' limited search of the vehicle because the officers were "justified * * * in their reasonable belief that Long posed a danger if he were permitted to reenter his vehicle." *Long,* 463 U.S. at 1050, 103 S.Ct. 3469.[37]

**37.** The Fourth Circuit followed this rationale in *United States v. Holmes,* 376 F.3d 270 (4th

Cir.2004). In that case, two suspects were secured by police presence which consisted of

We have also recognized that officers may search inside a vehicle for weapons prior to releasing a suspect into that vehicle precisely because when a suspect is "allowed to reenter his car after the search, he would be able to reach under the seat, pull out a gun, and start shooting." *State v. Gilchrist*, 299 N.W.2d 913, 917 (Minn.1980). We acknowledged the argument that the suspect "could hardly be viewed as a potential assailant after he had returned to his vehicle and knew he had not been detained by the police." *Id.* (internal quotation omitted). But we recognized "that there may be special situations in which it can fairly be assumed that the danger continues." *Id.* at 918. (inter-

nal quotation and brackets omitted). We found such a "special situation" in *Gilchrist* based on the officers' knowledge of the suspect involved in that case. *Id.* I would follow the same rationale in this case.[38]

Here, when the officers tried to stop Flowers' vehicle, he did not stop. Rather, in response to the officers' attempts to stop him, the officers saw what they reasonably believed was Flowers trying to hide something inside his vehicle. As Officer Hoff testified, the first thing he thought Flowers was hiding was a gun. In my view, consistent with *Michigan v. Long* and *Gilchrist*, the officers' actions here were reasonable.[39]

"[f]ive or six police cruisers." *Id.* at 272. The two suspects "were handcuffed behind their backs, frisked, and secured in caged, locked patrol cars, at least twenty feet away from" their car. *Id.* at 273. Yet the Fourth Circuit concluded that the officers had a reasonable fear for their safety justifying their protective search of the interior of the vehicle. *Id.* at 279–80 ("[R]egardless of the extent to which the suspects were incapacitated at the time of the search, the search of the car was a reasonable measure to protect the safety of the officers conducting the stop * * *.").

38. Several other states also recognize that officer concerns for safety continue to be objectively reasonable based on what might happen when a suspect is released into a car. *State v. Wausnock*, 303 A.2d 636, 637 (Del. 1973) ("[T]he applicable standard of care is not to be measured solely as of the moment of search when driver and passenger were outside the automobile; it is to be measured, also, as of the time when they may have been permitted to return to the automobile."); *State v. Vandenberg*, 134 N.M. 566, 81 P.3d 19, 28 (2003) ("We decline to say that an investigating officer cannot be in as much danger at the end of a traffic stop as at the beginning, or at least reasonably believe that to be so."); *State v. Smith*, 66 Or.App. 516, 674 P.2d 1206, 1208 (1984) ("To justify the seizure of a weapon which could be used against the arresting officer, we shall not draw a fine line measuring the possible risk to the officer's safety. The officer should be permitted to take every reasonable precaution

to safeguard his life in the process of making the arrest." (internal quotation omitted)); *See State v. McGill*, 234 Wis.2d 560, 609 N.W.2d 795, 804 (2000) ("It makes no sense to require an officer to cease a *Terry* frisk simply because he or she has found it necessary to place the individual he or she is searching in handcuffs. If the officer ultimately finds no probable cause to arrest and releases the suspect, he remains at risk of an armed assault because he has not removed the threat by completing the protective frisk."). I cannot sanction a rule that ignores this reality.

39. The majority relies on Officer Reynolds' testimony that the videotape was turned off because the "situation was under control" to support its conclusion that the officers no longer reasonably feared for their safety. With Flowers locked in the back of the squad car, the officers were able to safely pursue their investigation. But the question is whether it continued to be reasonable for the officers to return to the car to find the weapon they thought they saw Flowers hiding before they placed him back into the vehicle. That the situation was temporarily "under control" says nothing about what would happen once Flowers returned to the car. Moreover, the fact that the officers may not have known that Flowers was a felon when they found the gun he had hidden does not change the result in my view. The officers observed Flowers' frantic behavior, behavior that seemed to be taken directly in response to the officers' efforts to stop him. The officers

We have warned that "[a] court reviewing whether the police acted diligently and reasonably should not indulge in unrealistic second-guessing." *Moffatt*, 450 N.W.2d at 119; *see also United States v. Sharpe*, 470 U.S. 675, 686–87, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985) ("A creative judge engaged in *post hoc* evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished. * * * The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it."). The majority's conclusion that the officers' reasonable suspicion "had dissipated" by the time they found the gun strikes me as exactly the type of "unrealistic second-guessing" we said in *Moffatt* was not to be done. *Moffatt*, 450 N.W.2d at 119.

Indeed, we have never held police action unreasonable as a matter of law based on our assumptions of dissipation. Rather, we have done so only based on actual evidence in the record showing that police learned new information during their investigation which in fact caused the suspicion to dissipate. *See State v. Pike*, 551 N.W.2d 919, 922 (Minn.1996) (noting that reasonable suspicion "evaporates" if officers become aware "of any facts which would render unreasonable" the assumption underlying their suspicion).

For example, in *State v. Burbach*, the question was whether the police exceeded the scope of a permissible *Terry* stop through a search of the interior of the vehicle. 706 N.W.2d 484, 486 (Minn.2005). The car had been pulled over for speeding. *Id.* As the officer spoke to the driver, Burbach, he could detect an odor of alcohol, so he performed sobriety tests. *Id.* After these tests, "[t]he officer concluded that the odor of alcohol did not come from Burbach." *Id.* Instead, the adult passenger volunteered to the officer that he had been drinking. *Id.* at 489. Because the officer knew, after investigation, that the driver had not been drinking, we concluded that the officer's concern for a driving while impaired offense had resolved and there was not a reasonable basis to search the interior of the car. *Id.*

As *Burbach* illustrates, we do not speculate that police officers' suspicion of criminal activity dissipated. Instead, we require (at least we did before today) evidence of dissipation. There is no such evidence in this record.

Rather than a dissipation of reasonable suspicion that Flowers was engaged in criminal activity, the evidence confirms that the officers' suspicion continued, and in my view, it became even more pronounced. The suspicion became more pronounced because after taking the incremental steps our precedent authorized (the frisk of Flowers, the flashlight looks,[40] the 30–second protective sweep of the vehicle, and the dog sniff), the officers still had no explanation for Flowers' frantic and furtive

found nothing to explain that behavior and received information from Flowers that directly contradicted what they had witnessed. Under these circumstances, it was reasonable for the officers to return to the area they had seen Flowers manipulating before they returned him to his vehicle.

40. Our caselaw indicates that the officers' looks into the car with a flashlight were not searches. *See State v. Alesso*, 328 N.W.2d 685, 687 (Minn.1982) ("In numerous cases we have upheld against fourth amendment challenge the practice of police officers routinely shining flashlights into automobiles * * *."); *State v. Liljedahl*, 327 N.W.2d 27, 29 (Minn.1982) (noting that where car was lawfully stopped and while one officer "had the driver in the squad car checking his license, [the officer] was justified in reapproaching the stopped car and shining his flashlight in").

movements or his unwillingness to stop in response to the police. The record does not reflect that the officers discovered anything (for example, an insurance card, a spilled bottle of soda, an open bottle of alcohol) that would have been consistent with Flowers' furtive movements. Under the facts of this case, where the officers' incremental steps failed to reveal *anything* to explain, or that was consistent with, Flowers' frantic behavior as police were trying to stop him, I would conclude that this absence of evidence did nothing to render unreasonable what the majority admitted was earlier a reasonable suspicion that Flowers was engaged in criminal activity and was armed and dangerous. Instead, I would find that the absence of evidence served to enhance the officers' suspicions.

The majority attempts to find support for its dissipation theory in *State v. Payne,* 406 N.W.2d 511 (Minn.1987), but that case contradicts the majority's assumption of dissipation. In *Payne,* we applied the same rule I apply, namely, something that happens during an investigation—in that case it was the reaction of a police dog—may properly serve to confirm the reasonableness of an officer's suspicion. *See id.* at 514 ("[S]hortly before Officer Waller frisked defendant, Officer Champion and his tracking dog appeared on the scene and Champion stated that the dog had followed the track from the house where the intrusion occurred to the place where Waller had first seen defendant * * *."); *see also Wiegand,* 645 N.W.2d at 136 (noting that scope of permissible *Terry* stop can be expanded to support "investigation of only those additional offenses for which the officer develops a reasonable, articulable suspicion within the time necessary to resolve the originally-suspected offense."). Similar to *Payne,* what happened during the investigation in this case—specifically the officers' failure to discover anything to explain Flowers "frantic" and "furtive" movements—confirmed the reasonableness of the officers' suspicion in my view.

In addition to the officers' failure to discover anything to explain what they saw, Flowers' own statements to the police likewise served to reinforce the officers' suspicion. As the majority recognizes, when the officers were in the process of frisking Flowers, they asked him what he had in the car and he said that he did not have anything in the car. The officers also asked him to explain his behavior inside the car while the officers were trying to stop him and Flowers said that he was not doing anything. These statements contradicted what the officers had observed Flowers doing when he refused to stop his vehicle. And, as the Texas court recognized in *Balentine,* these statements from Flowers served to reinforce the officers' suspicion. *See Balentine v. State,* 71 S.W.3d 763, 769–70 (Tex.Crim.App.2002).

This is not to suggest that a police officer is entitled to search until he discovers a weapon or contraband. Rather, the standard advocated here is one that allows officers who observe repeated furtive conduct which supports a reasonable belief that the person is armed and dangerous and is hiding something (a belief the majority concedes exists in this case) in an area of a vehicle where *nothing* is found to explain that furtive conduct, it is reasonable and diligent for the officers to keep looking.

That is just what the officers did in this case. They did not return to the vehicle and begin to dismantle it. They did not expand their search into the trunk of the vehicle or any other area that was not reasonably related to Flowers' movements. Rather, one officer approached the vehicle when the driver's door was open and noticed that the panel on the driver's door

was loose from its frame. In light of Flowers' repeated furtive movements near the driver's door, his incredible claim that he was not doing anything when the officers were trying to the stop him, the absence of anything in the passenger compartment to explain Flowers' movements, and the dog's elimination of drugs, it was reasonable for the officers to pull the frame back "a little" to see if Flowers may have hidden a weapon in this area of the passenger compartment.

## II.

In the alternative, I would conclude, as did the court of appeals, that when the officer returned to the car and observed that the driver's door panel was loose, the officers had probable cause to believe that Flowers' car contained contraband. Thus, I disagree with the majority's holding that the search was not valid under the automobile exception. *See State v. Search*, 472 N.W.2d 850, 852 (Minn.1991) (discussing automobile exception).

I agree with the majority that furtive movements alone do not provide probable cause. But this case is about much more than furtive movements. *See State v. Gallagher*, 275 N.W.2d 803, 808 (Minn. 1979) (holding that defendant's furtive movements "attempting to shield" a paper bag from the officer, together with officer's observations that defendant and his passenger had "widely-staring eyes" gave officer probable cause to believe car contained contraband).

First, Flowers failed to stop when the officers tried to stop him. *See People v. Superior Court*, 3 Cal.3d 807, 91 Cal.Rptr. 729, 478 P.2d 449, 460 (1970) ("Of the various circumstances stressed * * * perhaps the most persuasive [of probable cause] is a driver's failure to stop his car promptly when a police officer signals him to do so.").[41] Second, as he continued to drive, the police saw Flowers' behavior and they testified that they believed, based on their training and experience, he was trying to hide a gun or contraband in the car. Third, when the officers asked Flowers what he had in the car he said that he had nothing in the car. And when the officers asked him to explain what they viewed to be his "frantic" behavior inside the car as they were trying to stop him, Flowers said that he was not doing anything. Flowers' answers were inconsistent with what the officers had observed. *See State v. Willis*, 320 N.W.2d 726, 728 (Minn.1982) (noting that where "defendant had acted suspiciously as if he were trying to conceal something[,][d]efendant's failure to give any explanation for this conduct only increased the grounds for suspicion"); *see also State v. Harris*, 333 N.W.2d 873, 875 (Minn.1983) (explaining that defendant's furtive act of turning ring on his hand so that setting was not visible, in part, provided the officers with probable cause to believe one of the rings was stolen). Fourth, the officers failed to discover anything to explain Flowers' movements during the frisk, the flashlight looks, the 30–second protective sweep of the car, and the dog-sniff. Fifth, as the officer approached the car, he saw that the door panel was loose. *See Ornelas v. United States*, 517 U.S. 690, 700, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996) ("To a layman the sort of loose panel below the back seat armrest in the automobile involved in this case may suggest only wear and tear, but to Officer Luedke, who had searched roughly 2,000 cars for narcotics, it suggested that drugs may be secreted inside the panel."). This was the exact area the officers saw Flowers manipulating when he continued to drive down

---

**41.** We described this decision from the California Supreme Court as "the seminal case concerning 'suspicious' or 'furtive' gestures." *Gallagher*, 275 N.W.2d at 806.

the alley after the police tried to stop him, and Officer Hoff testified that in his experience suspects hide contraband in the doors of cars.

We consider the "totality of the circumstances facing [the officers] at the time of the search" when assessing whether the police had probable cause. *See Gallagher,* 275 N.W.2d at 808.[42] In my view, the five facts discussed above, considered together, provided the officers with probable cause to believe that Flowers had hidden contraband in the driver's door. Accordingly, the search in which the officers located the gun was proper under the automobile exception.

I would hold that the district court properly denied Flowers' motion to suppress.

ANDERSON, RUSSELL A., Chief Justice (concurring in part, dissenting in part).

I join in the concurrence and dissent of Justice Gildea.

---

**42.** The majority individually analyzes each of the five facts discussed above and concludes that each is insufficient to provide probable cause. Of course my argument is not that each of the facts standing alone provides probable cause, but rather, in the totality of the circumstances, all of these facts gave the officers probable cause to search the vehicle in this case.