623 F.Supp.2d 998 (2009)
UNITED STATES of America, Plaintiff,
v.
Derrick Bernard ALLEN, Defendant.
Case No. 4:08CR257 HEA.
United States District Court, E.D. Missouri, Eastern Division.
June 5, 2009.
*999 Thomas S. Rea, Office of U.S. Attorney, St. Louis, MO, for Plaintiff.
St. Louis Fed. Public Defender, Federal Public Defender, St. Louis, MO, for Defendant.

OPINION, MEMORANDUM AND ORDER
HENRY EDWARD AUTREY, District Judge.
This matter is before the Court on the Memorandum and Recommendation, [Doc. No. 71], of United States Magistrate Judge Terry I. Adelman, pursuant to 28 U.S.C. § 636(b). Judge Adelman has recommended Defendant's Motion to Suppress Evidence, [Doc. 31], be denied. Defendant has filed Objections to the Memorandum and Recommendation.
When a party objects to a magistrate judge's report and recommendation, the *1000 Court must conduct a de novo review of the portions of the report, findings, or recommendations to which the party objected. See United States v. Lothridge, 324 F.3d 599, 600 (8th Cir.2003) (citing 28 U.S.C. § 636(b)(1)). This includes a de novo review of the magistrate's findings of fact, including any credibility determinations. Id. The court has reviewed the entire record, including listening to the audio recording of the hearing held on February 12, 2009 and reading the transcript thereof.

Discussion
In addition to renewing his grounds presented in his Motion to Suppress, Defendant specifically objects to Judge Adelman's findings: that the officers had reasonable suspicion to detain Defendant; that Defendant gave consent, either oral or written, to search his vehicle, business, and residence; that Defendant made incriminating post-arrest statements to the officers; and that any incriminating post-arrest statements made to officers were voluntary.
In his Memorandum in Support of his Motion to Suppress, Defendant argues that the officers did not have a reasonable suspicion for a Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) stop of the Defendant as he exited his truck.
The Fourth Amendment requires that law enforcement officers "must be able to articulate something more than inchoate and unparticularized suspicion or hunch" for making a brief investigatory, Terry stop. United States v. Sokolow, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) citing Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Courts consider the totality of the circumstances when evaluating the validity of a stop. Sokolow, 490 U.S. at 8, 109 S.Ct. 1581. Probable cause is not required nor is a preponderance of the evidence standard necessary.
The law is summarized in the holding of Terry that when an officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the person with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman, makes reasonable inquiries, there is nothing in the initial stages of the encounter which serves to dispel his reasonable fear for his own or others' safety, he is entitled to further protection of himself and others in the area to conduct a limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him. Such a search is a reasonable search under the Fourth Amendment and any weapons seized may properly be introduced in evidence against the person from whom they were taken. Terry, 392 U.S. at 30-31, 88 S.Ct. at 1884-1885.
United States v. Kent, 531 F.3d 642, 648-49 (8th Cir.2008).
Defendant argues that the police did not have reasonable suspicion to stop him, because the confidential informant ("CI") did not have a proven track record of reliability, and therefore, presumably, the CI must be treated like an anonymous tipster. This Court does not agree.
Though less reliable than informants with a proven record, unproven informants are more reliable than anonymous tipsters because the police can hold them responsible for false information. Cf. Florida v. J.L., 529 U.S. 266, 270, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000) (a tip from known informants is more reliable because their reputation can be assessed and they can be held responsible *1001 for fabrications); United States v. Salazar, 945 F.2d 47, 50-51 (2nd Cir.1991) (face-to-face informants are generally more reliable than anonymous tipsters because they can be held accountable for false information). Here, the informant had been enlisted by the detective to be a confidential informant, and therefore, could be held accountable by the detective for false information. The informant here was also more reliable than an anonymous tipster because the police were able to identify his basis of knowledge: that TKO had just left his house. See Alabama v. White, 496 U.S. 325, 329, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990) (anonymous tipsters are less reliable because the tip usually gives no indication of the basis for the caller's predictions), citing Illinois v. Gates, 462 U.S. 213, 227, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).
Kent, 531 F.3d at 648-49.
The officers verified some of the informant's information before stopping Defendant. See United States v. Brown, 49 F.3d 1346, 1349 (8th Cir.1995) (unproven informant requires some independent verification to establish reliability). The officers went to the address given, saw Defendant's truck as described, and they set up a surveillance. They verified the truck was Defendant's by checking the license plates on the truck. When Defendant stopped at his business, he made a leaning motion as if to put something under, or retrieve something from under, the seat of the truck. The officers had previously been told by the CI that Defendant carried a firearm under the front driver seat of Defendant's vehicle. As the informant here was not anonymous, less verification was required. Id., at 649. The Court finds that under the totality of the circumstances, the officers possessed a reasonable suspicion for the Terry stop. Defendant's objection is overruled.
Defendant also objects to the conclusion that the search of his vehicle and home were performed pursuant to his consent.
A search based on consent may be made by law enforcement officers without a warrant or probable cause, and any evidence discovered during the scope of the search may be seized and admitted at trial. Schneckloth v. Bustamonte, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). To determine whether consent was given voluntarily, courts examine the totality of the circumstances surrounding the consent. Id., 412 U.S. at 227, 93 S.Ct. 2041.
Factors that weigh on the court's determination of voluntariness include: (1) knowledge of the constitutional right to refuse consent; Id. at 227, 93 S.Ct. 2041; United States v. Becker, 333 F.3d 858, 861-62 (8th Cir.2003)(consent voluntary despite fact that officers did not inform suspect of rights, because suspect had knowledge of rights from prior experience with law enforcement); (2) age, intelligence, education, and language ability; Schneckloth, 412 at 226, 93 S.Ct. 2041; United States v. Jimenez, 478 F.3d 929, 932 (8th Cir.2007)(consent voluntary because "[t]here was no indication that [defendant] did not understand the officer's questions"); (3) the degree to which the individual cooperates with the police; United States v. Saenz, 474 F.3d 1132, 1137 (8th Cir.2007)(consent voluntary because defendant gave consent to search truck to two officers and did not complain or question officers during the search); (4) the individual's attitude about the likelihood of the discovery of contraband; United States v. Hathcock, 103 F.3d 715, 720 (8th Cir.1997)(consent to search duffle bag voluntary because suspect believed officers would inevitably detect illegal substances inside); Schneckloth, 412 U.S. at 226, 93 S.Ct. 2041; there was no evidence of any *1002 type of coercive police behavior or physical punishment and the detention was of very short duration; (5) the length of detention and the nature of questioning including the use of physical punishment or other coercive police behavior, Schneckloth, 412 U.S. at 226, 93 S.Ct. 2041; United States v. Bradley, 234 F.3d 363, 367 (8th Cir.2000).
Considering the factors listed above, the Court finds Defendant's consent to the search of the vehicle he was driving was voluntary and made with understanding. Defendant was familiar with his constitutional rights and criminal law. He had been convicted of prior offenses. Defendant is in his mid-thirties, owns his own business and generally appeared to be of normal intelligence. Defendant was not intimidated by the officers; he was not threatened by them in any manner. The conversation between Defendant and the officers was cordial and Defendant was cooperative. The officers did not make any misrepresentations. Defendant did not appear to be intoxicated nor under the influence of any drugs. Based on the totality of the circumstances, Defendant's consent to search his vehicle was voluntary and knowingly made.
With respect to the search of Defendant's residence,[1] the Court also concludes the search was voluntary. In addition to the above, Defendant signed a consent form for the search of his residence and business. The form contains information regarding the right to refuse to consent and that no promises, threats, force or physical or mental coercion had been made. Though there was conflicting testimony about whether Defendant signed the form, the Court agrees with Judge Adelman that, considering all of the attendant circumstances, Defendant did indeed sign the consent form. As such, both the search of the vehicle and Defendant's residence were conducted pursuant to Defendant's consent.
Defendant's objections to the incriminating nature of his statement and to the voluntariness of his statement are without merit. The record and testimony establish that Defendant stated that he had had the ammunition for some time. Further, Defendant gave several conflicting statements about the origin of the weapon in the vehicle. These statements can be used against Defendant. Defendant was advised of his rights and he purposely waived those rights. He was advised of his full rights from Miranda forms twice. His will was in no way overborne, rather, the conversations were cordial throughout. Nothing in the record and evidence presented establishes that Defendant's statement were anything but voluntary.

Conclusion
Having conducted a de novo review of the Motion to Suppress and the record before the Court, Defendant's objections are overruled. The Memorandum and Recommendation contains a very thorough analysis of the facts and applicable law. The Court, therefore will adopt Judge Adelman's Recommendation.
Accordingly,
IT IS ORDERED that Defendant's Motion to Suppress Evidence, [Doc. 31], is DENIED.

MEMORANDUM AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE
TERRY I. ADELMAN, United States Magistrate Judge.
The above matter was referred to the undersigned United States Magistrate *1003 Judge pursuant to 28 U.S.C. § 636(b). A hearing on the Defendant's motion to suppress evidence was held before the undersigned. Based upon the evidence adduced at the hearing on the motion to suppress, a review of the transcript of the hearing and the post-hearing briefs, the undersigned makes the following findings of fact and conclusions of law:

Findings of Fact
Michael Betz is a detective with the St. Louis Metropolitan Police Department. In April 2008, Betz received information from Michael Ramos, an Agent with the U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives, relating to the Defendant Derrick Allen.
Ramos informed Betz that a confidential informant had contacted Ramos and told him that Allen possessed firearms in his house and in his car, and that Allen also was involved in the sale of marijuana. The confidential informant knew Allen personally, and provided Allen's home address as 5538 Greer. In addition, the confidential informant identified a photograph of Allen from a photographic display of several pictures shown to him by Ramos and Betz. After receiving this information, Betz checked the police department records on Derrick Allen, and determined that he had been convicted of at least one felony crime, and had been to the Missouri State Penitentiary.
At about 8 a.m. on April 25, 2008, Betz received a phone call from Ramos' confidential informant, who told him that Allen currently was in possession of a .357 Magnum handgun with a brown handle. He told Betz that the handgun was then concealed under the front seat of the Defendant's white work truck, which was parked in front of the Defendant's house on Greer Avenue.
At this point, Betz, Ramos, and other officers of the St. Louis police department went to the area of the Defendant's house on Greer, and conducted a surveillance on the house. When they arrived at the location, they observed a white work truck parked in front of the Defendant's residence. A check of the license affixed to the truck revealed that it was registered to Derrick Allen. Further, a sign on the side of the truck showed that it was used by the Defendant at his place of business. After observing the truck and the residence for approximately one half hour, they observed the Defendant and another person come out of the house and sit on the steps of the front porch. After about two minutes, these two individuals left the front porch, and went to the truck. Derrick Allen entered the driver's side of the vehicle, and the other person sat in the passenger's seat. A short time later, Allen drove away from the premises with the police following him. Betz and the other officers followed the Defendant's vehicle to 6251 Page, which is about a five-minute drive from the Greer address. They observed the Defendant pull into a parking lot at a business location at that address. As the Defendant came to a stop, they observed him make a bending gesture at the waist, as if he were placing something under the front driver's seat or was removing something from under the front driver's seat of the vehicle. They observed the Defendant get out of the car, and when he did this, Betz and several other officers approached the Defendant. They detained the Defendant and the passenger of the vehicle, and told the Defendant that they had information that he had a gun and perhaps drugs concealed in the truck. They asked him if they could search the vehicle, and the Defendant readily consented to the search of the car. Betz and other officers then conducted a search of the vehicle, and discovered a loaded .357 Magnum handgun with a *1004 brown handle under the front driver's seat of the car. Betz then arrested the Defendant for unlawful use of a weapon, and being a felon in possession of a firearm. He fully informed the Defendant of his Miranda rights by reading his rights to him from a Metropolitan St. Louis Police Department Advice of Rights form. The Defendant stated he understood his rights. No threats or promises were made to the Defendant during the course of obtaining his consent to search the vehicle, and the Defendant was cooperative with the agents and officers. Their conversations, according to Betz, were cordial.
After the Defendant was placed under arrest, and advised of his rights, Betz asked the Defendant for permission to search the Defendant's business, which was the Page address, and his residence on Greer. The Defendant verbally consented to the searches. Because the Defendant was under formal arrest and in handcuffs, Betz followed his normal policy and prepared a formal consent to search form for the Defendant's signature. He also prepared the consent to search form because multiple locations were to be searched. After preparing the consent to search form for both the Defendant's house located at 5538 Greer and his place of business at 6251 Page, Betz handed the form to Derrick Allen and asked him to read the form. Allen appeared to read the form, and had no questions for Det. Betz. Just prior to the signature line, the form reads:
I understand that I have the right to refuse to consent to the search described above, and to refuse to sign this form. I further state that no promises, threats, force, or physical or mental coercion of any kind whatsoever have been used against me to get me to consent to the search described above, or to sign this form.
The Defendant had no questions for Det. Betz, and signed the form in the presence of Betz, Ramos, and other officers. Both Betz and Ramos testified that they personally observed the Defendant sign the form. Further, neither officer had known Allen prior to his arrest, or had any contact with Allen, and had never seen his signature prior to the Defendant signing his signature on the consent to search form.
The other person in the truck was identified by officers as the Defendant's brother, Daryl Allen. He was detained because he had an outstanding warrant for his arrest in the City of St. Louis. With Daryl Allen's permission, he was transported to the City of St. Louis so he could be processed on the arrest warrant.
After the business premises was searched by the officers, the Defendant Derrick Allen was transported back to his house on Greer along with the other officers. The Defendant remained in the car while Betz contacted the Defendant's wife in the house. He told the Defendant's wife that the officers had consent to search the house by way of a consent to search form, and asked her for her permission also to search the house. She told them she had no objections to the search, and pointed out the Defendant's bedroom to them. In this room, Betz found a wooden box which contained seven rounds of .357 ammunition, as well as papers and mail of Derrick Allen. The Defendant was shown the ammunition, and said he had had it for some time.
After the search, the Defendant was taken to the station by Ramos and the other officers. He was again fully advised of his rights by Ramos and stated he understood his rights. The Defendant was then asked about the gun found in his car, and gave several conflicting statements about the origin of the weapon.
*1005 The Defendant's brother, Daryl Allen, also testified during the hearing on the motion to suppress. Allen corroborated much of what Det. Betz and Agent Ramos said during the hearing. He stated that he had come out of the house on Greer with his brother, and sat on the front steps of the house for a short time before getting into the work truck with his brother, and driving to his brother's place of business on Page Avenue. Allen testified that as soon as the car was stopped on the parking lot of the business, several police officers approached the vehicle and immediately began looking inside of the vehicle. He said his brother had reached the inside of the work premises, and was escorted to the vehicle by officers. He said that he heard the officers tell the Defendant that they had information that his brother was in possession of firearms and drugs in the truck. He said the officers asked the Defendant's permission to search the truck, and the Defendant responded with words to the effect that "you are already searching my truck." He said the police officers searched the truck twice before finding an item which they described as a gun, but that Allen never personally observed the gun. He said that after the gun was discovered, he heard the officers ask his brother for permission to search his house, but he did not hear his brother's answer to this question. Under cross examination, Allen testified that he had lived with his brother and his brother's wife at his brother's house for more than a year. He also said that he worked for his brother, and his brother provided his source of livelihood for him by paying him for the work. He also admitted that he was a convicted felon, having been convicted of burglary and stealing.
Based on the above, the undersigned concludes that Allen's testimony corroborates the testimony of the police officers in several important and significant respects. It corroborates the surveillance conducted by the officers, the fact that the officers informed the Defendant of the nature of their investigation, and the fact that they asked the Defendant for consent to search his car and his house. To the extent that Allen's testimony contradicts the police officer and agent, the undersigned, who observed all of the witnesses testify in this case, accepts the testimony of Det. Betz and Agent Ramos, and rejects the testimony of Defendant's brother, Daryl Allen, to the extent it is at odds with the officer's and agent's testimony. The undersigned, as stated above, viewed the testimony of Agent Ramos and Det. Betz, and finds that they fully and credibly answered the questions of both the Assistant United States Attorney and the Defendant's attorney. The Defendant's brother has a personal interest in this case based on the fact that the Defendant is his brother, and his brother provides him a place to live and his source of income. Although the police officers also have an interest in this case, it is not a personal interest but, rather, a professional interest. Further, both the testimony of the police officers and the Defendant's brother show that the officers had never had any personal contact with Derrick Allen prior to his arrest on April 25, 2005, and had not heard of the Defendant until his name was mentioned to Ramos by the confidential informant. The undersigned therefore concludes that the officers have no motive to testify untruthfully or to "frame" the Defendant in any respect. Therefore, the undersigned accepts the testimony of Ramos and Betz in its entirety and rejects the testimony of Daryl Allen to the extent it contradicts the officers.[1]

*1006 Conclusions of Law

A. The Initial Detention of the Defendant
Based on the above facts, the undersigned concludes that the initial detention of the Defendant on the parking lot of his business premises was based on a reasonable, articulable suspicion on the part of the officers, that a crime was being committed and therefore it was lawful. In Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court held that a police officer may stop a person reasonably suspected of criminal activity, question that person briefly to determine whether the officer's suspicions are justified, and conduct a pat-down search for weapons if the officer reasonably believes that the person presents a risk to his safety or the safety of another. See Terry v. Ohio, supra. In explaining the principle of a "Terry" stop, the Supreme Court stated as follows:
. . . Under the Fourth Amendment, we have held, a policeman who lacks probable cause but whose "observations lead him reasonably to suspect" that a particular person has committed, is committing, or is about to commit a crime, may detain that person briefly in order to "investigate the circumstances that provoke suspicion.". . . "[T]he stop and inquiry must be `reasonably related in scope to the justification for their initiation.'". . . Typically, this means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions.
Berkemer v. McCarty, 468 U.S. 420, 439, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984).
*1007 Whether officers possess reasonable suspicion is to be determined by the Court "... `not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.'" United States v. Atlas, 94 F.3d 447, 450 (8th Cir.1996). Courts afford a great deal of deference to the conclusions of an officer because the officer may detect criminal activity from conduct which seems innocent to the untrained eye. United States v. Cortez, 449 U.S. 411, 418, 422, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). The Supreme Court has held that, when considered together, several innocent acts may be enough to show a reasonable suspicion. United States v. Sokolow, 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). One primary basis for reasonable suspicion is a police officer's personal observations which lead the officer to believe that a crime has been or is about to be committed. See Illinois v. Wardlow, 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000). In addition, the word of an anonymous informant, or one whose trustworthiness has not been tested, may nevertheless be sufficient to support reasonable suspicion if the information of this informant is corroborated. See Alabama v. White, 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990).
Based on the above, the undersigned concludes, given the totality of the circumstances, that the officers and agents possessed strong reasonable suspicion bordering on probable cause to arrest and detain the Defendant. Information from the informant, who was known to the officers but who had never been used before during an arrest, was specific and detailed. The informant gave the name and address of the Defendant, told the agents what type of vehicle the Defendant was driving, informed the agents that the Defendant was in possession of a specific type of firearm and the location of that firearm, and also informed the agents that the Defendant was involved in the sale of narcotics. The agents were able to corroborate much of the information given to them by the informant. They obtained a picture of the individual named by the informant, and provided him with a photographic spread which included the photographic spread which included the photograph of the Defendant. The informant positively identified the Defendant as the person who he was talking about. In addition, the agents were able to corroborate that the Defendant lived at the address which the informant gave them, and had a work-style truck registered to him which is exactly the same style truck as described by the informant. In addition, the agents were able to determine that the Defendant had been previously convicted of a felony crime, and, thus, could not lawfully possess a firearm.
In addition, as stated above, the informant told the agents that the Defendant was concealing a .357 Magnum firearm under the front driver seat of his work truck. He stated that it was being concealed in this location at 8 a.m. on April 25, 2008. The agents set up a surveillance on the Defendant's home and the vehicle described by the informant within two hours of the information being given to them. After following the vehicle from the Defendant's residence to his work, they observed the Defendant bend at the waist and reach under the front seat of his vehicle, as if he were placing or removing something from under the front driver's seat of the vehicle. The undersigned concludes that this "furtive" movement by the Defendant, when combined with all of the other specific information given to the officers by the informant, corroborate that the Defendant was likely concealing a firearm under the front seat of his vehicle. See United States v. Evans, 994 F.2d 317 (7th Cir. *1008 1993); United States v. Lego, 855 F.2d 542 (8th Cir.1988). Therefore, the undersigned concludes that, at the very least, there was reasonable suspicion to detain the Defendant.

B. The Consent to Search
The undersigned concludes that the consent to search the vehicle for the weapon and the written consent to search the Defendant's premises was lawful. Police officers may. search premises or a vehicle if they obtain consent to do so from someone who has adequate authority over the premises or the vehicle. That the Defendant had authority over his own vehicle and his own house is not disputed by the Defendant. Further, consent is voluntary if it is the product of free choice, and not given under duress or coercion. Voluntariness if a fact question to be determined by the totality of the circumstances present. See Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); United States v. Matlock, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). Among the factors to be considered in determining whether consent is voluntary include the following: whether the person who consented was detained and questioned for a long or short period of time before granting consent; whether the person was threatened, physically intimidated, or punished by the police; whether the defendant relied on promises and representations made by the police; whether the defendant was in custody or under arrest when consent was given; whether consent was given in a public or secluded place; whether the defendant objected to the search or stood silently while the search occurred; the age of the defendant; the general intelligence of the defendant; whether the defendant was intoxicated or under the influence of drugs; whether the defendant consented after being informed of his rights; and whether, because the defendant had been previously arrested, he was aware of the protections afforded to suspected criminals by the legal system. See United States v. Chaidez, 906 F.2d 377, 381, 382 (8th Cir.1990); see also United States v. Willie, 462 F.3d 892 (8th Cir. 2006).
Given the above factors, the undersigned concludes there is little doubt that the consent was given voluntarily. The Defendant, at the time the consent to search the car was given, had been detained by the police officers for at most a few minutes, therefore he had not been detained for a long period of time. The Defendant was not threatened, physically intimidated or punished by the police. No promises or misrepresentations were made to him by police. The evidence shows that the Defendant was not threatened in any way, and that his conversations with the police were cordial, and the Defendant cooperated with the police. The consent was given on the parking lot of the Defendant's place of business and was not given at a police station or another secluded place. The Defendant did not object to the search at any time, and, as stated above, was, in fact, cooperative with police officers in allowing the search. In addition, the Defendant appears to be in his mid-thirties, and, according to the officers, was rational, not intoxicated, or under the influence of any drugs while he consented. Further, the Defendant evidently owns and runs his own business, employs his brother, and otherwise appeared to the officers to be of at least normal intelligence. Further, the Defendant had been convicted of felony crimes before, and although he was not formally advised of his Miranda rights prior to the search of the vehicle, he was certainly no novice to the legal system. Based on all of the above, the undersigned concludes that the Defendant's consent was voluntarily given both to search his *1009 car and his premises. As to the premises, the Defendant signed a written consent form after being advised that he did not have to consent to the search of his home. Therefore, the evidence seized from the Defendant's vehicle and home should not be suppressed.

C. Post-Arrest Statements
Based on the above facts, the undersigned concludes that the Defendant knowingly and intelligently waived his rights, and that his statement was voluntary. The Government has the burden of showing that a defendant's statement is voluntary, and further, that the waiver of the defendant's Miranda rights is both voluntary and "knowing and intelligent." See Colorado v. Spring, 479 U.S. 564, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987); United States v. Turner, 157 F.3d 552 (8th Cir.1998). Regarding custodial statements, the Eighth Circuit Court of Appeals has stated as follows:
The appropriate test for determining the voluntariness of a confession is whether in light of the totality of the circumstances, pressures exerted upon the suspect have overborne his will ...
United States v. Meirovitz, 918 F.2d 1376 (8th Cir.1990). Based on the above facts, the undersigned concludes that the Defendant's statements were voluntarily given after he was fully advised of his rights and waived those rights. The evidence shows that the Defendant was twice advised of his full rights from Miranda forms, at first after his initial arrest by Det. Betz, and later at the police station before being asked specific questions about the weapons and ammunition by Agent Ramos. On both occasions, the Defendant stated that he understood his rights, and waived his rights by agreeing to answer questions. The Defendant was not threatened in any way nor was he promised anything in return for his statements. The conversations were cordial, and the Defendant was cooperative. Therefore, based on the above, the undersigned concludes that the Defendant's statements were voluntarily made after he was fully informed of his rights and waived those rights. See Miranda v. Arizona, 384 U.S. 436, 467-75, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); North Carolina v. Butler, 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979); Colorado v. Connelly, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986); Moran v. Burbine, 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986).

Conclusion
Therefore, the Defendant's motion to suppress evidence should be denied.

* * *
In accordance with the Memorandum above,
IT IS HEREBY RECOMMENDED that the Motion of Defendant to Suppress Evidence [Doc. # 31] be denied.
Further, the parties are advised that they have eleven (11) days in which to file written objections to this recommendation and determination. Failure to timely file objections may result in waiver of the right to appeal questions of fact. Thompson v. Nix, 897 F.2d 356, 357 (8th Cir.1990).
NOTES
[1] The Court notes that the officers also searched Defendant's business. No incriminating evidence was found inside the business.
[1] Both the Defendant and the Government had expert witnesses testify as to the hand-writing on the consent form in this matter. The Defendant's expert, Steven McKasson opined on direct examination of the Defendant's signature on the Consent to Search form was likely a forgery. On cross-examination, McKasson testified that he could not eliminate the Defendant as a person who had possibly signed the consent form, and stated that there were some similarities between the Defendant's known signature and the consent form signature. He further stated that the forgery was not an "awful forgery" as is the case with almost all forgeries. The Government's expert, James Hayes, testified that in his opinion, there was a strong probability that he [Defendant] "authored the questioned signature." (Tr. 130). Further, when asked if the signature on the consent form was a forgery, Hayes responded, "Absolutely not." (Tr. 150). When asked on cross-examination if it was possible that the signature was forged, he responded as follows:

I think it's extremely unlikely, and I couldn't sit here and say that it's likely to be a forged signature because I don't believe that. I think this is a genuine signature.
Given the inconclusive nature of the testimony of both experts in this matter, and the unequivocal testimony of both Agent Ramos and Det. Betz, the undersigned accepts as credible the testimony of Agent Ramos and Det. Betz, that the Defendant signed his name to the consent form, and that no one else signed the consent form except the Defendant. First, the undersigned concludes that agents had already received an oral consent from the Defendant to search his vehicle, and had found a fully loaded firearm under the front seat of the Defendant's vehicle. Thus, prior to any alleged forged consent, the officers had lawfully seized the weapon with which the Defendant now stands charged. That being the case, there was no need to forge a consent form to search the Defendant's house. Further, the evidence shows that the officers were not acquainted with the Defendant, and had never seen his signature. The undersigned concludes that it was highly unlikely under the circumstances that the officers forged the signature of the Defendant, particularly when both experts state that the signature on the consent form contains similarities to the Defendant's actual signature. Therefore, the undersigned concludes that the officers are credible, and accepts their testimony that the Defendant signed the consent to search form.